# United States Court of Appeals
## For the First Circuit

No. 08-1886

ROSA LINDA VERA,

Plaintiff, Appellant,

v.

JOHN McHUGH,* Secretary of the Army,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté,  U.S. District Judge]

Before

Torruella, Selya, and Lipez, Circuit Judges.

Vilma M. Dapena-Rodríquez for appellant.
Rebecca E. Ausprung, with whom Rosa Emilia Rodríquez-Vélez, United States Attorney, and R. Brian Bohlen, Special Assistant U.S. Attorney, U.S. Army Litigation Division, were on brief, for appellee.

October 6, 2010

---

* Pursuant to Fed. R. App. P. 43(c)(2), Secretary of the Army John McHugh has been substituted for former Secretary of the Army Pete Geren as the respondent.

**LIPEZ, Circuit Judge.** In this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the plaintiff, Rosa Linda Vera, alleged that she was sexually harassed by a coworker and subsequently by a supervisor at the Fort Buchanan Army garrison in Puerto Rico, and then fired in retaliation for filing her sexual harassment complaints. Both claims of sexual harassment involved allegations depicting a hostile work environment. The district court found that Vera's first sexual harassment claim was not properly before it because she had failed to exhaust her administrative remedies and her equitable estoppel argument did not excuse the failure. On the merits, the court granted summary judgment for the defendant on Vera's second sexual harassment claim and her retaliation claim.

After careful consideration, we affirm the district court's grant of summary judgment to the defendant on Vera's first claim of sexual harassment and on her retaliation claim. Finding that Vera has created a genuine issue of material fact on her second sexual harassment claim involving her supervisor, Raul Rodriguez, we vacate the district court's grant of summary judgment on that claim and remand for further proceedings consistent with this opinion.

**I.**

We recite the facts in the light most favorable to Vera, the nonmoving party. See Agusty-Reyes v. Dept. of Educ. of P. R.,

-2-

601 F.3d 45, 48 (1st Cir. 2010).

## A. Sexual Harassment Complaints

Vera began working for the Army as a civilian administrative assistant in the El Caney Lodge of Fort Buchanan in April 2002 and was promoted six months later to the position of administrative coordinator in the Training Support Center Division. On January 30, 2003, she met with an internal Equal Employment Opportunity ("EEO") office counselor to report that she was being sexually harassed by a co-worker, Mario Morales. The counselor filled out a "Pre-Complaint Intake Interview" form in February 2003 in which he recorded Vera's informal complaint. On the form, he indicated that he provided Vera with a handout entitled "Rights and Responsibilities" and that he specifically advised her of "[t]he basis(es) for filing pre-complaint, formal complaint, and/or class complaint, and of right to file," "the pre-complaint, formal and/or class complaint process," "the 45-day requirement from effective date of personnel action or of the date of the matter alleged to be discriminatory contact," and the role of the EEO counselor, among other things. Although the counselor's notes on the form stated that Vera was "satisfied with the response and clarification provided by management" and "would not proceed with her EEO allegation" while she gave management time to "improve the work place," the EEO office never recorded the resolution of Vera's informal complaint in a document containing her signature. At some point in early October 2004, as part of the resolution of her

complaint, Vera was moved to a different area where she would have an office with privacy and a door. According to Vera, she did not consider the matter resolved either by that location change or by any other steps taken by the EEO office.

On September 30, 2004, shortly before moving offices, Vera had a dispute with Rafael Contreras, the Acting Chief of the Training Division at Fort Buchanan. Vera was issued a disciplinary letter by Hector López, the Director of Plans, Training, Mobilization, and Security, after Contreras reported that Vera responded in a loud, disruptive and insubordinate manner when she was asked the status of an overdue work assignment. According to Contreras' report, when he asked Vera about her project, she told him she was not going to do the work and asked him why he did not do it himself. According to Vera's deposition testimony, Contreras called her a pig. Vera left her workstation immediately after the incident to report it to López. After seeing López, she left the base. The disciplinary letter issued by López reminded Vera that "unless otherwise indicated by management/supervisor, your place of duty is at Bldg 511" and "whatever duties you must do should be done in the office/workplace." The letter warned Vera that "future instances on [sic] leaving the work area without informing your supervisor or not requesting leave may be charged absent without leave (AWOL). This may lead to more severe disciplinary actions if it is not adhered too [sic]."

-4-

In October 2004, Raul Rodriguez became the Chief of the Training Division at Fort Buchanan, replacing Contreras. As such, he was Vera's direct supervisor. According to Rodriguez, when he assumed the position, he was informed that there had been a problem between Vera and Contreras, but he was not made aware of Vera's January 2003 informal sexual harassment complaint against Morales. Rodriguez became aware of Vera's complaint against Morales in approximately December of 2005.

It appears that Rodriguez was not officially assigned an office of his own when he assumed his new position. Instead, according to Vera, he "worked out of" her office, which had a computer with an internet connection. In her deposition, she stated that it was "his primary office just like mine." Rodriguez asserts, and Vera does not dispute, that there were no other offices in that building with computers connected to the internet. Vera suggests, however, that Rodriguez could have worked from another supervisor's office, which she describes as "five times the size" of her own.[1] There was also an empty office in the building with computers but no internet connection where Vera could go, and did on occasion occupy, when Rodriguez was using the computer in her primary office. Vera was the only woman working in that building at Fort Buchanan.

---

[1] It is not clear whether that office had a computer with an internet connection.

Rodriguez and Vera used the same office for approximately three months during a period from October 2004 to the beginning of March 2005.[2]  According to Vera, Rodriguez was in their shared office "most of the time," although he did leave to go to meetings. During the time that she and Rodriguez were using the same office, Vera described herself as experiencing "a constant invading [of] my space."  She described how Rodriguez would sit staring at her while they were in the office with the door closed and would block the door as she tried to leave.  Vera explained that Rodriguez would look at her in a sexual way and then "smirk and laugh" because he knew it bothered her.  At times, Rodriguez would move his chair so close that their legs would touch, or he would stand close behind her so that she could feel his breath.  Although Vera acknowledged that the office was small and was not big enough for the two of them, she maintained that the touching could not have been accidental.  Vera told Rodriguez not to invade her space.  In response, Rodriguez moved away from her, but according to Vera it happened again until "after a while, I guess he knew I was serious."

Vera stated that Rodriguez invaded her space in public as well as in the confines of the office.  When asked to elaborate, she described one incident, at an unspecified date, when Rodriguez came too close to her in front of a coworker and a client forcing

_____

[2] Vera was on leave for the month of January 2005 and thus was not using the office during that time.

her to leap away to avoid contact with him. Vera also described objectionable comments Rodriguez made to her. On one occasion, Rodriguez referred to Vera as "Baby," while on another, he told her on a stormy day that her "hair looked like the weather," a comment she found to be derogatory and offensive to her "as a woman."

When asked during an EEO investigation about the effect of Rodriguez's behavior on Vera, Yarita Lopez, an operations specialist who was one of Vera's friends on the base, stated, "I witnessed every single day her emotional distress that I never . . . saw [] before his arrival to the division." She described the distress as "constant," and explained, "[i]t was not only physically, but mentally and emotionally." She described Vera as having "outbursts of crying and disbelief and despair of every single action that he was doing." A note from Vera's doctor written in April 2005 also attests to this severe emotional toll. The note states that Vera would need to be out of work from March 18, 2005 through May 18, 2005 due to "Depression Disorder with Anxiety, affected by the work environment."

The shared office arrangement ended sometime in late February or early March 2005 when Vera began to work out of the empty office in order to avoid Rodriguez in her own office. She was later moved to yet another office as part of a large office reorganization coordinated by Rodriguez. Vera filed an informal sexual harassment complaint against Rodriguez on May 4, 2005.

**B. Retaliation**

Given the complicated history underlying Vera's retaliation claim, and given the importance of the sequence of events to an evaluation of her claim, we have divided the account of the relevant facts into discrete time periods.

> 1. December 21, 2004 through March 3, 2005: Vera's Initial Extended Absence and Rodriguez's Response

During the time that she and Rodriguez were using the same office, from October 2004 through March 21, 2005, Vera was absent from work for over a month, from late December 2004 until the beginning of February, 2005. On December 21, 2004, Vera and Rodriguez discussed her need for time off to attend to her health issues and those of her children.[3] Vera had been absent or left early frequently in order to go to appointments with doctors or take her children to appointments.[4] She did not have any remaining paid leave of any kind. Rodriguez encouraged Vera to take a few weeks of unpaid leave in order to attend to her appointments in the hope that consolidating those appointments would permit her productively to resume her duties. According to Rodriguez, he

---

[3] Vera's health issues and those of her children were apparently related at least in part to a car accident in the fall of 2003 in which Vera and her two children were injured.

[4] According to an affidavit submitted by Joann Morales, the timekeeper for the Directorate of Plans Training, Mobilization and Security at Fort Buchanan, Vera was present for duty 816.75 hours and was absent on leave without pay for 783.25 hours between January 1, 2004 and October 2, 2004.

requested that Vera provide documentation of her medical appointments so that he could approve the absence and he was under the impression that Vera's absence would begin in January. Vera was absent from December 27, 2004 to February 1, 2005. She did not provide any medical documentation prior to her leave. Vera stated that Rodriguez himself was on leave at the end of December so that she could not personally deliver the medical documentation to him. She was unable to explain why she did not leave the documents in the office for him or email them to him before her absence began.

In late January 2005, before Vera's return to work, Rodriguez exchanged emails with Fabiana Nevado, his human resources advisor within the Civilian Personnel Advisory Center. Rodriguez sought advice on how to deal with Vera's absence, given her failure to submit a formal leave request or provide medical documentation before or during her absence. After Vera returned, on February 1, 2005, Rodriguez kept records of his employees' comings and goings for a day. He noted that four employees, including Vera, arrived late and/or left early on that day. Rodriguez called a staff meeting on February 7, 2005 to go over the problems he had observed, after which Vera went to speak to him but was rebuffed by Rodriguez, who told her they could speak later.

On February 2, 2005, Vera submitted a letter from a doctor dated December 23, 2004, recommending that she be on an extended leave of absence to recuperate from trauma. On February

22, 2005, Rodriguez wrote a counseling letter to Vera citing her month-long absence and failure to follow established leave procedures. The letter explains that if an employee needs leave, "the request has to be submitted along with an SF-71 and it has to be approved by the supervisor prior to taking leave." Rodriguez advised Vera that her unauthorized absences were affecting her job performance and that more serious disciplinary action, "up to and including removal from your position," might result from her failure to comply with the procedures in the future.

On March 3, Vera attended a leave and attendance workshop. On the same day, Vera received and acknowledged a memorandum from Rodriguez stating that the doctor's statement she provided was "not adequate" because it lacked a "diagnosis and prognosis of [her] medical condition." In the memo, Rodriguez requested that Vera provide a statement that "includes the nature of your illness, the expected time it will take for rehabilitation and your physical limitations during this period," as well as the duties she was unable to perform.

2. March 4, 2004 through May 18th, 2005: Vera's Second Extended Absence and Rodriguez's Response

On March 4, 2005, Rodriguez was informed by Joann Morales, the timekeeper for the Directorate of Plans Training, that Vera had called to say that she was sick and would be seeking medical help. In her deposition, Morales testified that the proper procedure for an employee to provide notice that he or she would be

coming in late or needed time off was to notify the supervisor directly and that she herself followed that procedure. She acknowledged that there was a custom that employees would call her if they would be late or needed to be absent. Nevertheless, in such cases, the employees would also contact their supervisors. After hearing from Morales, Rodriguez communicated with Nevado in Human Resources about Vera's absence. Nevado responded to Rodriguez that Vera should be considered Absent Without Leave ("AWOL") for March 4. On March 9, Rodriguez spoke to Vera, explaining that in order to be excused from work, she was required to speak to him personally as her supervisor.

Beginning on March 21, 2005, Vera was absent from work continuously until August 23, 2005. Her initial absence was based on a medical recommendation that she be out for two weeks and then be reevaluated. Throughout the summer, Vera's doctor continued to recommend that she not report to work due to depression and stress caused by her work environment. Vera did not submit the paperwork having to do with her absences to Rodriguez. It is unclear from the record exactly what documents were submitted and to whom, but Vera communicated with Joann Morales about her absences on a few occasions and seems to have left medical documentation with her as well.

In mid-April, after Joann Morales again emailed Rodriguez to inform him that Vera had called to say she would continue to be

absent until May 18 and would bring in the medical paperwork the following day, Rodriguez emailed the Civilian Personnel Advisory Center stating that he would write a memorandum for the record about the absence.  On May 9, Rodriguez issued Vera a notice of proposed suspension due to her failure to follow established leave procedures.

### 3. May 18, 2005: Rodriguez Receives Notice of Vera's Sexual Harassment Complaint Against Him

Rodriguez was informed of Vera's sexual harassment complaint against him through a letter from the EEO office on May 18, 2005.[5]  On May 19, 2005, the office of the Inspector General wrote to Vera in response to her sexual harassment complaint against Rodriguez, which she had directed to that office.  The letter informed Vera that an inquiry had been conducted into her request for assistance in dealing with the sexual harassment.  According to the Inspector General, the inquiry found that she did not adhere to rules and procedures established by her supervisors and accused her of "constant insubordination and refusal to obey orders, and defiance of authority."[6]

On May 23, Rodriguez directed Joann Morales to change Vera's December/January absence from Leave Without Pay to AWOL.  He

---

[5] As noted earlier, Vera filed her complaint on May 4, 2005.

[6] Vera contends that no investigation took place.  The record does not reveal any additional documentation of the investigation.

-12-

also directed that her initial March absence be changed from AWOL to Leave Without Pay.

4. Late May 2005 through August 22, 2005: Supervisory Response to Vera's Continued Absence

During the remaining period of Vera's absence, her supervisors discussed her absence in an email chain. The emails discussed the need for an independent medical evaluation of Vera and the fact that her supervisors had no information about what types of job functions she might be able to perform when she returned, if and when she would return, and the precise nature of her illness.

On July 28, 2005, Hector López issued a notice of decision to suspend to Vera. The notice informed Vera that López had reviewed Rodriguez's May 9th notice of proposed suspension and found that, as stated in Rodriguez's earlier notice, Vera failed to follow established leave procedures and was AWOL without providing reasons to justify her absence. López suspended Vera for 14 days beginning on August 8, 2005. On August 1, 2005, López issued a memorandum to Vera in which he informed her that her absence was having an adverse impact on operations. The letter states that Vera never provided the additional information requested in Rodriguez's letter of February 24th, detailing her medical prognosis and physical limitations. The letter warns that López considers her "numerous absences from work from December 2004 until the present" to be unreasonable. The letter goes on to request

that Vera report for duty on August 23, 2005 or provide medical documentation "identifying duties which can be performed and current limitations."

### 5. August 23, 2005 through October 7, 2005: Vera's Return to Work, Breakdown, and Termination of Her Employment

On August 23, 2005, Vera reported to work as requested, bringing with her a note from her doctor stating that she needed "to continue to be out of work, but she is willing to try going back to work." The note stated that Vera had a follow-up appointment with the doctor on August 30, 2005 at 3pm. It is unclear to whom Vera delivered her doctor's note. On August 26, 2005, Vera emailed Rodriguez explaining that she had to take paperwork to another office and that she would be at a meeting later that afternoon. Rodriguez forwarded Vera's email to Nevado stating that Vera had not reported to him. On August 29, Rodriguez again emailed Nevado to say that he had seen Vera, but that she had not reported to him. By this time, Rodriguez was using the office he and Vera had shared and Vera had been relocated to a different office.

On August 30, Vera, through another employee, requested that Rodriguez give her leave to attend her medical appointment. When her request was denied, Vera suffered a nervous breakdown and had to be taken to the hospital by ambulance. Vera explained that her illness was precipitated by Rodriguez, who spent time pacing up and down her office that morning.

-14-

On August 31, 2005, the day after Vera's breakdown at the office, Rodriguez issued her a notice of proposed removal from federal service. The notice states that Vera did not perform any of her assigned duties after returning to work on August 23rd, was discourteous, and failed to observe proper leave procedures. The August 31st notice also states, in reference to her breakdown at the office of the previous day, that Vera caused a disruption and "created a disturbance at the work site." The notice characterizes that behavior as "totally unacceptable" and states that it "will not be tolerated any longer." Vera was also apparently asked to submit medical documents to support her leaving work in the ambulance on August 30th.

On September 14, 2005, López issued a memorandum barring other employees from talking to Vera "on employment matters or requests for documents about personnel issues." According to Rodriguez, that memorandum was issued because Vera was "asking for statements from people . . . to say what happened and things like that. . . . She was kind of collecting information." Both Rodriguez and Morales stated that they were not aware of similar orders being issued in other instances. Vera was terminated from her employment on October 7, 2005.

## C. Proceedings Below

Vera filed an informal EEO complaint against Rodriguez

alleging sexual harassment on October 26, 2005.[7]  She filed a formal complaint on December 8, 2005.  On August 7, 2006, Vera brought this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5, against the Secretary of the Army,[8] alleging sexual harassment and retaliation.  On January 11, 2008, after the taking of depositions and the exchange of documents, the defendant moved to dismiss or, in the alternative, for summary judgment.  The district court granted the defendant's motion for summary judgment as to all claims.  Vera filed this timely appeal.

## II.

### A. Standard of Review

To survive summary judgment on her harassment and retaliation claims, Vera must establish a genuine issue of material fact as to whether she experienced sexual harassment or was retaliated against within the meaning of Title VII.  Fed. R. Civ. P. 56(c).  "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (internal quotation

---

[7] This second informal complaint seems to duplicate the informal complaint she filed against Rodriguez on May 4, 2005.

[8] The Secretary was sued in his capacity as Vera's employer. Title VII does not create liability against individual employees. See Fantini v. Salem State Coll., 557 F.3d 22, 28-31 (1st Cir. 2009).

marks omitted).  We review the district court's grant of summary judgment de novo.  Lockridge v. The Univ. of Me. Sys., 597 F.3d 464, 469 (1st Cir. 2010).  While we draw "all reasonable inferences" in the light most favorable to Vera, as the nonmoving party, we will not "draw unreasonable inferences or credit bald assertions, empty conclusions, [or] rank conjecture."  Cabán-Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (emphasis in original).

## B. Sexual Harassment under Title VII

In 1972, Congress extended the protection provided by Title VII of the Civil Rights Act of 1964 to federal employees. Section 717 of the Civil Rights Act, codified at 42 U.S.C. § 2000e-16, "provides that all personnel actions affecting federal employees and applicants for federal employment 'shall be made free from any discrimination based on race, color, religion, sex, or national origin,'" and "establishes an administrative and judicial enforcement system."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 829-30 (1976).  Title VII's ban on discriminatory employment practices "extends to sex-based discrimination that creates a hostile or abusive work environment."  Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)).  This sex-based discrimination is

-17-

commonly referred to as "sexual harassment." Meritor, 477 U.S. at 67.[9]

Not all harassing conduct falls under the prohibition of Title VII, however. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Id. (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)); see also Billings, 515 F.3d at 47-48. The environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

There is no single test by which we evaluate a claim of sexual harassment to determine whether the plaintiff has presented sufficient evidence to survive summary judgment. Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006). Rather, we look to "all the circumstances," a list which includes, but is not limited to: the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating as opposed to a mere offensive utterance, whether it "unreasonably interfered with an employee's work performance," and "the effect of the conduct on the employee's psychological well-being." Che v.

---

[9] Here and throughout this opinion, we use "sexual harassment" to refer to the hostile work environment form of sexual harassment. In doing so, we do not suggest that the term "sexual harassment" is limited to describing hostile work environment claims.

Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003).  It is the jury's job to "weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002).  The court's role in evaluating such claims is to "polic[e] . . . the outer bounds."  Id. (internal quotation marks omitted).

On a motion for summary judgment in a sexual harassment case such as this, we must distinguish facts that merely add up to the "ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing," Faragher, 524 U.S. at 788, which can never support a Title VII claim, from those suggesting "sexual remarks, innuendoes, ridicule, and intimidation" which "may be sufficient to support a jury verdict for a hostile work environment."  O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

1. Sexual Harassment Claim Involving Rodriguez[10]

In awarding summary judgment to the defendant, the district court found that the comments made by Rodriguez, coupled with Vera's "general sense of unease," did not amount to a hostile work environment.  We disagree both with the district court's characterization of the facts of record and with the legal

----

[10] Although Vera's claim against Rodriguez was made two years after her claim against Morales, we address it first before delving into the procedural issues involved in disposing of the claim against Morales.

-19-

conclusion it reached. Taking the facts in the light most favorable to Vera, as we must on summary judgment, we cannot rule, as a matter of law, that the circumstances of Vera's employment did not constitute a hostile work environment. See Billings, 515 F.3d at 50.

For three months,[11] until Vera removed herself to a different office, Rodriguez shared her workspace for multiple hours every day, stared at her in a sexual way, came so close to her that she could feel his breath, pulled his chair next to her so that their legs touched, laughed at her discomfort, blocked her escape from the cramped office with a closed door, and on one occasion called her "Babe." While they were sharing an office, and again after Vera returned from an extended leave, Rodriguez maintained his practice of drawing inappropriately close to her and smirking at her when she backed away. As a result of Rodriguez's conduct, Vera suffered psychological and emotional distress that her friend and co-worker characterized as "constant."[12]

_____

[11] There is some confusion about the length of time during which Rodriguez and Vera shared an office. The government seeks to characterize the time period as two months, but other accounts in the record suggest that the time period was three months. Mindful of our duty to take the facts in the light most favorable to the nonmoving party on summary judgment, we adopt the three month number, as the length of time most coherently suggested by the record.

[12] The dubitante opinion of our colleague describes this conduct as "the kind of incidental contact that is unavoidable in cramped quarters . . ." and the "easily predicable sequelae of [the] spatial assignment." That innocent characterization of the conduct alleged is incompatible with the summary judgment standard,

-20-

The conduct Vera alleges involves many, if not all, of the factors we use to guide us in determining whether a claim such as hers may survive summary judgment. See Marrero, 304 F.3d at 18-19. The alleged conduct by Rodriguez was described by Vera as "constant" because Rodriguez was in their shared office "most of the time." Although Rodriguez did not overtly threaten Vera, the allegation that he blocked her from leaving the office on at least one occasion suggests a physically threatening environment. When Rodriguez looked at her "up and down" in a sexual way,[13] she felt extremely uncomfortable, an understandable reaction to sharing an office with a supervisor who finds his subordinate's discomfort

---

which requires us to view Vera's evidence in the light most favorable to her. Thus, viewed independently of Vera's reaction to Rodriguez's conduct, a jury could reasonably conclude that Rodriguez was purposefully exploiting the smallness of the office that he shared with Vera to sexually harass her. Moreover, contrary to the suggestion of the dubitante opinion, that conduct falls well within our sexual harassment precedents. See discussion of Billings and Marrero infra.

[13] The government seeks to discredit Vera's allegation of sexual staring as uncorroborated. It is not Vera's burden on summary judgment to provide additional proof that Rodriguez stared at her lasciviously while the two of them were alone in her office with the door closed. On summary judgment, when confronted with a case of conflicting testimony from the plaintiff and defendant, we are bound to take the facts in the light most favorable to the nonmoving party so long as they are not simply "bald assertions" or "empty conclusions." Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) (internal quotation marks and citation omitted).

amusing and intentionally causes that discomfort by placing his body inappropriately close to hers in the small office.[14]

Vera also states that she occasionally left her office while Rodriguez was there in order to escape him; ultimately, she removed herself from the office entirely. Although proof of such interference is not necessary to maintain a successful claim of a hostile work environment, conduct that forces an employee to abandon his or her own office during the workday could reasonably be seen as interfering with that employee's work performance. Che, 342 F.3d at 40 (finding an employer's interference with an employee's use of his radio, which might hamper his work performance, supported a hostile work environment claim). Further, although some lack of privacy and personal space was inherent in the odd circumstance of having both Rodriguez and Vera working in a small office, the facts and attendant circumstances suggest that Rodriguez went out of his way to violate Vera's privacy and the integrity of her personal space. Finally, there is testimonial and

---

[14] Contrary to the government's assertion, the absence of a sexual proposition by Rodriguez does not preclude Vera's success on her claim as a matter of law. See Billings, 515 F.3d at 48 (reversing summary judgment for defendant on hostile environment claim, despite absence of touching or propositioning, when supervisor stared repeatedly at plaintiff's breasts). A sexual proposition is not the sine qua non of sexual harassment. See Id. ("'[A] worker need not be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed.'" (quoting Quick v. Donaldson Co., 90 F.3d 1372, 1379 (8th Cir. 1996)).

-22-

documentary evidence that Rodriguez's conduct caused Vera to suffer psychologically.[15]

Our case law supports the conclusion from this summary judgment record that Vera suffered severe and pervasive harassment in the form of a hostile work environment. In <u>Billings</u>, for example, we found that an employee whose supervisor stared at her breasts whenever the two came in contact over the course of more than two years had asserted a cognizable claim of severe and pervasive harassment. 515 F.3d at 50. In <u>Marrero</u> v. <u>Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 19 (1st Cir. 2002), we found that it was reasonable for the jury to conclude that an employee whose supervisor made sexual comments to her and touched her inappropriately on five occasions over the course of a little over one year had experienced sexual harassment. 304 F.3d at 19.

Here, a jury could find that the intensity and frequency of the contact between Vera and Rodriguez altered the conditions of her employment despite the relatively short duration of their office-sharing. That Rodriguez's behavior caused Vera psychological trauma that persisted even after she had left the hostile environment, as evidenced by Lopez's testimony and the

---

[15] Specifically, as described above, Vera's coworker stated that she observed Vera's emotional distress, in the form of outbursts of crying, and that she witnessed Vera's despair and disbelief at Rodriguez's actions. Similarly, a doctor's note stated that Vera could not return to work because she was experiencing anxiety and depression "affected by the work environment."

-23-

doctor's note written in April 2005, reinforces the conclusion that she experienced harassment that was both severe and pervasive. Likewise, it would be reasonable for the jury to conclude, based on Vera's account of Rodriguez's conduct, that his conduct was so objectively offensive that a reasonable person would find it to be hostile or abusive. See Faragher, 524 U.S. at 787; Meritor, 477 U.S. at 67. As we have explained elsewhere, "it is one thing to say that employees must learn to tolerate simple teasing, offhand comments, and isolated incidents (unless extremely serious). . . . It is quite another to require employees to suffer the constant attentions of a lascivious supervisor." Marrero, 304 F.3d at 19 (internal quotation marks and citation omitted). Therefore, we are unable to conclude, as a matter of law, that such conduct on the part of a supervisor is an "ordinary tribulation[] of the workplace." Faragher, 524 U.S. at 788. Rather, the facts portray the kind of sexual harassment that Title VII was intended to address.

2. Sexual Harassment Claim Involving Morales

a. Procedural Requirements for Federal Employees Under Title VII

Under Title VII, an aggrieved federal employee may "file a civil action in a federal district court." Brown, 425 U.S. at 832; see also 42 U.S.C. § 2000e-16(c). Prior to doing so, however, "the complainant must seek relief in the agency that has allegedly discriminated against him." Brown, 425 U.S. at 832. The specific

procedures for seeking agency relief, in turn, are set by the Equal Employment Opportunity Commission (EEOC) pursuant to its authority to "issue such rules, regulations, orders and instructions as it deems necessary to carry out its responsibilities."  42 U.S.C. § 2000e-16(b).

EEOC regulations provide a highly structured set of steps which must be taken by the agency and the aggrieved party as the complaint process proceeds.  29 C.F.R. §§ 1614.103-.707.  At the outset of the process, "[a]ggrieved persons . . . must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."  Id. § 1614.105(a).  That consultation must be initiated "within 45 days of the date of the matter alleged to be discriminatory . . . ."  Id. § 1614.105(a)(1).  If the matter has not been resolved, "the aggrieved person shall be informed in writing by the Counselor, not later than the thirtieth day after contacting the Counselor, of the right to file a discrimination complaint" with the EEOC or the on-site EEO Office.  Id. § 1614.105(d).  The employee has fifteen days after the receipt of that notice to file the complaint.  Id.  After the employee has filed a discrimination complaint, he or she may bring a civil suit in federal court "only if the EEOC dismisses the [discrimination complaint], or if it does not bring civil suit or enter into a conciliation agreement within 180 days of the filing of the [discrimination complaint]."  Franceschi v. U.S. Dep't of Veterans

<u>Affairs</u>, 514 F.3d 81, 85 (1st Cir. 2008) (citing 42 U.S.C. § 2000e-5(f)(1)).

Although typically a failure to exhaust administrative remedies will bar suit in federal court, "the exhaustion requirement is not a jurisdictional prerequisite" to filing a Title VII claim in federal court. <u>Federique-Alexandre</u> v. <u>Dep't of Nat'l & Envtl. Res.</u>, 478 F.3d 433, 440 (1st Cir. 2007). Rather, the "time period for filing a charge is subject to equitable doctrines such as tolling or estoppel." <u>Nat'l R. R. Passenger Corp.</u> v. <u>Morgan</u>, 536 U.S. 101, 113 (2002) (citing <u>Zipes</u> v. <u>Trans World Airlines, Inc.</u>, 455 U.S. 385, 393 (1982)). Such doctrines "are to be applied sparingly," <u>id.</u>, however, and this circuit takes "a narrow view of equitable exceptions to Title VII exhaustion requirements." <u>Frederique-Alexandre</u>, 478 F.3d at 440 (quotation marks omitted).

We have recognized two related doctrines whereby a plaintiff may modify or avoid the Title VII filing period: equitable estoppel and equitable tolling. In this case, we are concerned solely with equitable estoppel. Equitable estoppel is appropriate when an employee is aware of her Title VII rights but does not make a timely filing "due to [her] reasonable reliance on [her] employer's misleading or confusing representations or conduct." <u>Kale</u> v. <u>Combined Ins. Co. of Am.</u>, 861 F.2d 746, 752 (1st Cir. 1988) (citing <u>Dillman</u> v. <u>Combustion Engineering Corp.</u>, 784

-26-

F.2d 57, 60-61 (2d Cir. 1986)).[16]  An employee must also show "[e]vidence of either the employer's improper purpose or his constructive knowledge of the deceptive nature of his conduct." Id.  That evidence must be in the form of some "definite, unequivocal behavior . . . fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security." Clauson v. Smith, 823 F.2d 660, 663 (1st Cir. 1987).

In determining the applicability of an equitable remedy, a court must also look to "any countervailing equities against the plaintiff," such as whether she "diligently pursue[d]" the claim. Katle, 861 F.2d at 753.  For example, some courts have held that "to invoke an estoppel as a shield against a statute of limitations defense, a plaintiff must show that [s]he brought [her] action within a reasonable time after the facts giving rise to the estoppel have ceased to be operational."  Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1494 (2d Cir. 1995) (internal quotation marks omitted); see also Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1324 (11th Cir. 1989) (per curiam); Ott v. Midland-Ross Corp., 523 F.2d 1367, 1370 (6th Cir. 1975).

---

[16] Although Kale and a number of the cases we cite involved the Age Discrimination in Employment Act (ADEA), rather than Title VII, we have held on numerous occasions that "'judicial precedents interpreting one such statute [are] instructive in decisions involving [the other].'"  Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 47 n.7 (1st Cir. 2005) (quoting Camacho v. P.R. Ports Auth., 369 F.3d 570, 578 n.5 (1st Cir. 2004)).

b. Vera's Claim

We review for abuse of discretion the district court's ruling rejecting the application of equitable estoppel in Vera's case. Abraham v. Woods Hole Oceanographic Inst., 553 F.3d 114, 119-20 (1st Cir. 2009) (reviewing district court's refusal to equitably toll the statute of limitations in Title VII case for abuse of discretion).

It is undisputed that Vera failed to exhaust her administrative remedies in pursuing her claim against Morales. She argues, however, that the government should have been estopped from asserting her noncompliance with the exhaustion requirement in their defense because the EEO Office "prevented [her] from filing a formal complaint" due to procedural irregularities in dealing with her informal complaint. Specifically, she asserts that she did not know how or when to file a formal complaint because the EEO office did not follow the correct procedure in pursuing her informal complaint and failed to give her the required notice after it closed her informal complaint.

Although the record supports Vera's contention that the EEO Office at Fort Buchanan did not comply fully with EEOC regulations when dealing with her informal complaint against Morales, it does not support her claim that she was unaware of how to pursue her claim, nor does it show that she diligently pursued her claim. Also, she has made no showing that she was actively

misled into failing to file her claim such that the procedural irregularities by the government should estop it from asserting Vera's failure to exhaust her administrative remedies in its defense.

The EEO Office failed to follow established procedures in two respects. First, it did not generate a settlement "in writing and signed by both parties" identifying the claims resolved, 29 C.F.R. § 1614.603, as is required if an agreement is reached resolving a complaint.[17] Additionally, the EEO Office did not notify Vera in writing of her right to file a formal discrimination complaint, as would have been required if the matter had not been resolved within thirty days of her first contacting the EEO Officer. See id. § 1614.105(d).

Nevertheless, the record shows that Vera was, in fact, informed of the specific procedural steps involved in continuing to pursue her claim. The intake interview form filled out after Vera filed her informal complaint with the EEO officer reveals, and Vera does not deny, that she was "provided with the handout entitled Rights and Responsibilities." Among other things, she was also

---

[17] The record shows that Vera filed her informal complaint against Morales on January 30, 2003, Morales made a signed statement on February 18, 2003, and the EEO Officer wrote a memorandum on February 21, 2003 stating that the matter had been resolved and that Vera "was satisfied with the response and clarification provided from management." There is no space for a signature from Vera on the EEO Officer's statement and no subsequent correspondence between the EEO Officer and Vera concerning her complaint against Morales.

"specifically advised" of "[t]he pre-complaint, formal and/or class complaint process." In the face of such notice, Vera's claim that because of the government's actions she simply did not know how or when to file a formal complaint is unsupportable.

Furthermore, as noted above, a plaintiff invoking estoppel "must show that [s]he brought [her] action within a reasonable time" after it became clear that any promised alternate remedy from an employer would not be forthcoming. Buttry, 68 F.3d at 1494. Here, Vera was given notice at the outset of the process that she was to be informed in writing, not later than the 30th day after contacting the EEO Office, of her right to file a formal discrimination complaint. She would then have fifteen days to file a formal complaint. Because of an apparent misunderstanding between the department and Vera about the settlement of her claim, she never received the notice of her right to file a formal discrimination complaint. As the government admits, given the EEO Office's failure to issue her that notice, the equities might have favored excusing some delay on Vera's part in filing her formal complaint. For almost three years after lodging her informal complaint against Morales, however, Vera took no steps to pursue her claim until she filed this lawsuit on August 7, 2006. The government's failure to memorialize properly the putative settlement of her claim against Morales, or to give proper notice

-30-

of the absence of any settlement of that claim, does not justify that lack of diligence on Vera's part.

Finally, Vera points to nothing in the record that would show that the EEO office had either an "improper purpose" or "constructive knowledge of the deceptive nature" of its processing of Vera's complaint, such that estoppel would be appropriate. Kale, 861 F.2d at 752.  Although the procedures for closing her informal complaint were evidently bungled, this is not a case in which the office actively misled her about her rights or attempted to deceive her through false representations of its own actions. Compare Ott v. Midland-Ross Corp., 600 F.2d 24, 29-30 (6th Cir. 1979) (finding estoppel may be appropriate when employer falsely assured employee that it would settle the claim by appointing him to a new position); Bonham v. Dresser Indus., Inc., 569 F.2d 187, 193 (2d Cir. 1977) (finding estoppel potentially applicable when no notice of ADEA rights was posted and employer falsely indicated to employee that there would be another position for him within the company).  To the contrary, Vera was given a statement of her rights from the outset and informed of them during her intake interview.  The district court was well within its discretion in finding that Vera was not entitled to the benefit of equitable estoppel.

## C. Retaliation Claim

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. § 2000e-3(a). In order to establish a prima facie claim of retaliation under Title VII, a plaintiff must make a showing (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action. Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997).

If a plaintiff makes out a prima facie case of retaliation (and there is no dispute on that issue here), a rebuttable presumption of unlawful retaliation arises and "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision." Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (citation and quotation marks omitted);[18] see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973) (establishing burden-shifting framework for Title VII cases). In order to rebut that

---

[18] Because of the relatedness of the two statutes, we refer to cases interpreting the retaliation provision of the Americans with Disabilities Act (ADA) interchangeably with those specifically addressing Title VII. Carreras, 596 F.3d at 36 n. 10 (citing Soileau, 15 F.3d at 16).

-32-

presumption, the employer does not have the burden of persuasion, but must simply produce evidence of a legitimate, nondiscriminatory reason for the employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). The district court found, and we agree, that the government met its burden by producing evidence to show that Vera was fired for being insubordinate and failing to follow established leave procedures.

Once the employer produces such evidence, the presumption "drops from the case" and the court must focus on the "ultimate factual issue." U.S. Postal Serv. Bd. of Governors v. Aiken, 460 U.S. 711, 715 (1983). Here, that issue is whether Vera has cited facts in the record from which a reasonable jury could conclude that she experienced an adverse employment action because she filed sexual harassment complaints against her employer. See Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007) (proceeding directly to the question of causation and finding plaintiff's retaliation claim under the ADA must fail because no causal connection had been established between the adverse employment action and her protected conduct). Looking at "the total package of proof offered by the plaintiff," Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003), we find that Vera has not provided sufficient evidence for a reasonable jury to conclude that she was fired, or experienced other adverse employment actions, because of her sexual harassment complaints.

1. Retaliation for Vera's Sexual Harassment claim against Morales

As evidence of retaliation for her sexual harassment complaints, Vera cites a series of adverse events that took place between September 2004 and September 2005. Many of the actions she identifies as retaliatory, thus, occurred well after she filed her informal complaint against Morales in January 2003, but before she filed her first sexual harassment complaint against Rodriguez, in May 2005. If these incidents were caused by retaliatory animus at all, therefore, that animus could only be a response to Vera's complaint against Morales.

The events Vera points to during this time period as examples of adverse actions taken in retaliation for the filing of her sexual harassment complaint are: (1) her relocation to a different office in the fall of 2004, (2) the discipline that she received after her altercation with Contreras (her supervisor prior to Rodriguez), and (3) Rodriguez's conduct towards her, including his repeated requests prior to May 19, 2005, the date he learned of her sexual harassment complaint against him, that she comply with established leave procedures.

Vera's suggestion that she was relocated in retaliation for her complaint against Morales is belied by her own sworn deposition testimony, in which she agreed that her relocation was part of the resolution of her complaint. The altercation with Contreras took place nine months after Vera filed her complaint

against Morales.  She does not explain how that episode, which involved a person wholly unrelated to her harassment complaint, or the disciplinary action that resulted from the altercation, were related to the harassment complaint.

Similarly, Vera points to nothing in the record to suggest that Rodriguez's behavior was connected to her complaint against Morales.  Vera cites no evidence suggesting that Rodriguez knew about Vera's complaint against Morales prior to December of 2005, when he was informed of it as part of the investigation of the complaint against himself.  Rodriguez was not Vera's supervisor at the time she filed her complaint against Morales and Vera points to no evidence that he was ever present in the building where Vera and Morales worked or connected with the Morales complaint in any way.  It would, therefore, be impossible for a rational jury to conclude that Rodriguez's actions from October 2004 through mid-May 2005, which were taken in ignorance of Vera's sexual harassment complaint against Morales, were motivated by his desire to retaliate against her for those complaints.

2. Retaliation for Vera's Sexual Harassment Complaint Against Rodriguez

Vera cites the close temporal proximity between Rodriguez being informed of Vera's sexual harassment complaint against him on May 18, 2005 and his decision to change her leave status from Leave Without Pay to AWOL on May 23, 2005 as evidence of retaliation.  As we have cautioned in the past, however, "[t]iming may bear on the

question of causation in a retaliation claim, but . . . a 'narrow focus [on timing may] ignore[] the larger sequence of events and also the larger truth.'" <u>Freadman</u>, 484 F.3d at 100-01 (quoting <u>Soileau</u>, 105 F.3d at 16). In this instance, the larger sequence of events reveals that Rodriguez had been corresponding with his human resources advisor about Vera's absences since January, that in February he had monitored Vera's movements when she was at the office and wrote her a letter of counseling relating to her December/January absence, and that earlier in May he had issued Vera a notice of proposed suspension due to her failure to follow established leave procedures. Rodriguez's decision to change Vera's absence to AWOL, however poorly explained, is consistent with his previous actions, which show that he was focused on her lack of proper documentation for that absence, that he had requested additional documentation, and that he had warned Vera that she could be suspended for her failure to comply with established leave procedures.

In the same May memorandum in which he changed the status of her December/January absence, Rodriguez changed Vera's March absence from AWOL to Leave without Pay, further contradicting the theory that he was acting out of a desire to punish Vera for filing her harassment complaint. Given the series of adverse actions Rodriguez took in response to Vera's December/January absence, it would not be reasonable for a jury to conclude, based only on the

temporal proximity of one of those adverse actions to the date on which Rodriguez learned of the complaint, that the action was motivated by retaliatory intent.

Vera's remaining claims of adverse actions suffer from the same infirmity, namely, a lack of causal connection with her sexual harassment complaint.  The additional events Vera cites all occurred late in the summer of 2005, when she had been absent for several months.  As described previously, Vera was suspended in early August for being AWOL after being informed a week earlier that her continued absence was in violation of established leave procedures.  In late August, she was called back to work in a letter warning that her numerous absences were unreasonable and that she must report to duty or provide medical documentation "identifying duties which can be performed and current limitations," despite a note from her doctor stating that she was not ready to return.  Finally, after returning to work briefly, she suffered a breakdown.  After being absent again for almost a month, she was fired.

It is undisputed that Vera did not report to work from late March 2005 until she was requested to return in late August 2005.  Her hours absent far exceeded her hours worked for the first eight months of 2005.  Her supervisors were clearly perturbed by Vera's absences and the record shows that they discussed how to deal with a situation in which an employee was not reporting to

work and had not had her leave officially approved by management. There is, admittedly, a factual dispute over whether Vera was or was not complying with the intricacies of established leave procedures. That dispute, however, is not material to Vera's claim of retaliation for her sexual harassment complaint. The requests that Vera provide more extensive documentation of her illness and of what work functions she could no longer carry-out began with Rodriguez's request in February 2005, when he knew nothing of her complaint against Morales and before her complaint against him. The activity of her supervisors in discussing what to do about her absence over the summer, once she had been absent for several months, is wholly consistent with Rodriguez's initial communications with human resources about Vera and with his initial memoranda to Vera herself demanding additional documentation for her absences and cautioning her about the potential consequences of her failure to comply. Moreover, Vera's altercation with another supervisor, Contreras, in September 2004, supports the government's proffered explanation for her firing -- namely, that she was absent without leave and had been insubordinate.

## III.

For the reasons discussed above, we **affirm** the district court's dismissal of Vera's claim of sexual harassment against Morales without prejudice. We also **affirm** the district court's grant of summary judgment to the defendant on Vera's retaliation

claim.   We **vacate** the district court's grant of summary judgment for the defendant on the sexual harassment claim against Rodriguez and **remand** for further proceedings consistent with this opinion.

Each party shall bear its own costs on appeal.

<u>So ordered</u>.

**-- Dubitante Opinion Follows –**

**SELYA**, <u>Circuit Judge</u> **(dubitante)**.  I join readily in much of the majority opinion, but I write separately because I doubt the correctness of Part IIB1, which vacates the entry of summary judgment with respect to the plaintiff's sexual harassment claim against Rodriguez.  To my mind, the district court's assessment of the appropriateness of summary judgment on that claim, <u>see</u> <u>Vera</u> v. <u>Harvey</u>, Civ. No. 06-1761, slip. op at 18-20 (D.P.R. Apr. 22, 2008) (unpublished), is better reasoned and more persuasive.

The claim is, of course, utterly factbound, and it would serve no useful purpose for me to repastinate ground already thoroughly plowed by the district court.  Nevertheless, I think that a few words of caution may be of service in future cases.

First, I am constrained to point out that the majority opinion in this case goes well beyond the outermost frontier adumbrated in any of our earlier sexual harassment precedents.  To that extent, the precedential value of the majority opinion should be viewed with some skepticism.

Second — and more importantly — the majority discerns a trialworthy issue where the only conduct attributable to Rodriguez — occasional glances at, and inconsequential remarks to, a fellow employee, the closing of an office door in a crowded workplace, the kind of incidental contact that is unavoidable in cramped quarters — does not seem to support the inference that the majority draws from it.  In my view, the majority deems this conduct adequate to

sustain liability not because it is in any way evocative of sexual harassment but, rather, because the plaintiff considers it to be evocative of sexual harassment.  Although the majority pays lip service to the case law that impresses a standard of objective reasonableness on such claims, see, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008), it effectively subordinates this objective to the tug of the plaintiff's subjective feelings.  That distortion starts us down a slippery slope toward the imposition of some sort of general civility code in the workplace.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  That destination ought not to be on our itinerary.

At the risk of belaboring the obvious, let me add that this is not a case in which there is evidence of quid pro quo harassment (or, indeed, of any sexual interest in the plaintiff). There is no hint of anything that might fairly be characterized as a hostile, abusive, or sexually charged workplace.  There is no evidence of thinly veiled innuendo, offensive banter, or sexual hijinks of any kind.  There is only evidence that the employer, for business reasons, assigned the plaintiff and Rodriguez to share an undersized office.  The events that followed were easily predicable sequelae of that spatial assignment. With nothing in the record to suggest that the spatial assignment itself was made for the purpose

of bothering the plaintiff, I doubt that a claim for sexual harassment will lie.

I am confident that the majority will agree that sexual harassment liability ought to be reserved for conduct which, objectively viewed, is severe or pervasive enough to create a work environment that a reasonable person would find hostile or abusive. I very much doubt that the summary judgment record in this case satisfies that benchmark. As the majority opinion leaves it, any employee who is compelled to share a small office with a disliked co-worker will be able to mount a claim for sexual harassment without much, if anything, in the way of evidence.