**Alexandra M. RODRIGUEZ–CANDELARIO,**
**Plaintiff,**

**v.**

**MVM SECURITY INC.,**
**et al., Defendants.**

**CIVIL NO. 15–1850 (GAG)**

United States District Court,
D. Puerto Rico.

Signed 03/01/2017

Humberto F. Cobo–Estrella, Cobo–Estrella H. Law, LLC, for Plaintiff or Petitioner.

Ana B. Rosado–Frontanes, Schuster & Aguilo LLC, for Defendant or Respondent.

## OPINION AND ORDER

GUSTAVO A. GELPI, UNITED STATES DISTRICT JUDGE

Alexandra M. Rodríguez–Candelario ("Plaintiff") filed this employment discrimination suit against MVM Security, Inc., MVM International Security, Inc., and MVM, Inc. (collectively "MVM"), alleging that she was discriminated on the basis of her sex and retaliated against for engaging in a protected activity. Plaintiff seeks redress under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 ("Title VII") for injuries suffered as a result of the defendants' acts of discriminatory and retaliatory actions. For the damages purportedly sustained due to defendants' retaliatory conduct, Plaintiff seeks several awards, one for punitive damages under 42 U.S.C. § 1981a. (See Docket No. 1 ¶¶ 1–12, 60–64, 70–77.) Additionally, Plaintiff invokes the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for other claims arising un-

der Puerto Rico law.[1] Id. ¶¶ 60–80.

Pending before the Court are MVM's motion for summary judgment at Docket No. 39, Plaintiff's cross-motion for summary judgment at Docket No. 63–3, and MVM's motion to strike at Docket No. 88. After reviewing the parties' submissions and pertinent law, MVM's motion for summary judgment is **GRANTED**.

## I. Relevant Factual and Procedural Background

### A. The parties and the ICE Contract

MVM provides security services to U.S. Immigrations and Customs Enforcement ("ICE") and other Federal Government entities. (Docket Nos. 39–1 ¶ 1; 63–1 ¶ 1.) MVM and ICE have a contract in place ("ICE Contract") under which MVM provides security services at several facilities, including the General Services Administration ("GSA") Center and the Luis Muñoz Marín International Airport ("Airport"). (Docket Nos. 39–1 ¶ 2; 63–1 ¶ 2.) MVM employees working under the ICE Contract are required to have security clearances issued by ICE. (Docket Nos. 39–1 ¶ 3; 63–1 ¶ 3.) If ICE receives any disqualifying information concerning an MVM employee, the ICE Contract requires MVM to remove the employee from duty, though it is not required to *terminate* the employee. (Docket Nos. 39–1 ¶ 4; 63–1 ¶ 4.) Similarly, ICE may direct MVM to remove an employee for security reasons. (Docket Nos. 39–1 ¶ 5; 63–1 ¶ 5.)

Plaintiff began working for MVM on or around March 5, 2007 as an on-call detention officer. (Docket Nos. 39–1 ¶ 6; 63–1 ¶ 6.) She worked under the ICE Contract. Id. MVM later transferred Plaintiff to a "Rover" position, still within the ICE Contract. Id. Plaintiff's responsibilities as a Rover, included processing, escorting, feeding, and clothing detainees at the GSA Center and the Airport. (Docket Nos. 39–1 ¶ 7; 63–1 ¶ 7.) A typical workday for Plaintiff would start at the GSA Center, from where she would transport detainees to the Airport and other locations. Id.

Plaintiff was required to obtain an Airport Identification Badge ("Airport ID") in order to work at the Airport. (Docket Nos. 39–1 ¶ 18; 63–1 ¶ 18.) As part of the process of obtaining an Airport ID, detention officers such as Plaintiff had to fill out an application and complete a Security Identification Display Area training, which explained how to use the Airport ID and the security concerns related to its use. (Docket Nos. 39–1 ¶ 19; 63–1 ¶ 19.) As part of the process of filling out the application, the applicant must agree to abide by certain federal regulations on airport security. (Docket Nos. 39–1 ¶ 19; 42–3 at 26; 63–1 ¶ 19.)

The Airport ID is necessary to access the Airport's secured and restricted doors. (Docket Nos. 39–1 ¶ 20; 63–1 ¶ 20.) In order to gain access to the Airport's restricted areas, an authorized person must first swipe the Airport ID through a card reader, then enter his or her personal code, and finally open the door. Id. In order to avoid unauthorized access to restricted areas, only one authorized person—subject to limited exceptions—should go through the door at a time. Id. Each

---

**1.** Plaintiff filed supplemental claims alleging discriminatory conduct on the basis of her sex and retaliation under Puerto Rico's Law No. 100 of June 30, 1959, as amended, P.R. Laws Ann. tit. 29, §§ 146 ("Law 100") and Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, §§ 194a ("Law 115"), respectively. Plaintiff also filed a wrongful dismissal claim under Law No. 80 of May 30, 1976, as amended, P.R. Laws Ann. tit. 29, §§ 185a, ("Law 80"), and damages claims under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141–5142.

authorized person who intends to pass through a secured door must go through the same process. Id. MVM employees received verbal training on the proper use of the Airport ID, including the appropriate procedure for passing through secured doors; they did not receive "hands-on tutorials" or demonstrations on how to use the Airport ID. Id.

## B. Events of June 14, 2014

On June 14, 2014, Plaintiff was scheduled to start work at 2:00 P.M. at the GSA Center. However, due to the significant amount of work expected for that day, Supervisor Detention Officer César Méndez ("Supervisor Méndez") called Plaintiff early during the morning of that day and requested that she start "as soon as possible". (Docket Nos. 39–1 ¶ 25; 63–1 ¶ 25.) During her phone call with Supervisor Méndez, Plaintiff informed him that prior to reporting for duty she had to drop-off a relative at the Airport. (Docket Nos. 39–1 ¶ 26; 63–1 ¶ 26.) She also informed Supervisor Méndez that she would be dressed in her work uniform, given that she planned to head straight towards the GSA Center after dropping off her relative. Id.

Upon arriving to the Airport, Plaintiff called MVM employee Martha Bonilla ("Bonilla"), who was on-duty at the time, and agreed to meet at the American Airlines counter, where Plaintiff's relative was waiting. (Docket Nos. 39–1 ¶ 28; 63–1 ¶ 28.) Plaintiff and Bonilla then proceeded to escort Plaintiff's relative to the security checkpoint. Id. Afterwards, Plaintiff and Bonilla made their way to the JetBlue terminal, where Plaintiff's relative was waiting for them. Id. In order to get to the JetBlue terminal, Plaintiff and Bonilla went through the Airport's secured doors and accessed restricted areas, where they were supposed to follow the aforementioned identification process. (Docket Nos. 39–1 ¶ 29; 63–1 ¶ 29.) That day, Plaintiff and Bonilla were together from 9:03 A.M. to 10:44 A.M. (Docket Nos. 39–1 ¶ 30; 63–1 ¶ 30.) Throughout this time, Plaintiff was not working. Id.

The parties dispute whether Plaintiff informed Supervisor Méndez that she intended to access restricted areas during her visit to the Airport to drop-off her relative and that Bonilla would escort her through these areas. (Docket Nos. 39–1 ¶ 27; 63–1 ¶ 27.) Defendants claim that Plaintiff lacked authorization to access restricted areas and to use her uniform while off-duty. (Docket No. 39–1 ¶ 27.) On the other hand, Plaintiff claims that Supervisor Méndez explicitly authorized her to wear the uniform during her trip to the Airport, and that "[a]t all relevant times during her visit to the [Airport], Supervisor César Méndez was aware of [Plaintiff's] presence and knew what she was doing. Supervisor Méndez never disapproved nor asked her to leave the premises." (Docket No. 63–1 ¶ 27.)

MVM claims to have received information that Plaintiff went to the Airport in uniform and that she gained improper access to restricted areas ten days after the event, on June 24, 2014. (Docket No. 39–1 ¶¶ 31–33.) Plaintiff counters that, since Supervisor Méndez authorized her actions, MVM was aware of the incident the day it occurred. (Docket No. 63–1 ¶ 27.) Plaintiff claims that MVM only investigated the alleged incident after Abraham Ortiz, the MVM employee Bonilla named in her harassment and discrimination complaint, raised it in retaliatory fashion. (Docket No. 63–1 ¶ 41.)

MVM eventually examined the Airport's security videos for that day and determined that Plaintiff passed through secured doors without following the required procedure and, instead, gained access by passing through the secured doors after

Bonilla introduced her Airport ID and access code.[2] (Docket Nos. 39–1 ¶¶ 32–33; 63–1 ¶ 32–33.)

On July 2, 2014, MVM assessed a disciplinary action against Plaintiff for accessing secured doors while off duty with her Airport ID, and for allowing Bonilla to "piggyback" off Plaintiff's Airport ID and access code. (Docket Nos. 39–1 ¶ 35; 63–1 ¶ 35.) The disciplinary action entailed a suspension from work and a removal of her Airport ID. Id. MVM alleges that the decision to suspend Plaintiff was not based exclusively on the "piggybacking" incident and, instead, was driven by her past disciplinary history as well, "which included three disciplinary actions in the [prior] year and a prior suspension related to one of those actions." (Docket No. 39–1 ¶ 35.) Plaintiff rejects Defendants' justification for the suspension, arguing instead that the timing of the suspension reveals its true, retaliatory, motive given that it occurred precisely the day before Plaintiff was to testify in a separate harassment and discrimination proceeding against MVM. (Docket No. 63–1 ¶ 35.) Similar to Plaintiff, MVM suspended Bonilla for "piggybacking" or gaining improper access to secured areas and for leaving her post for almost two hours to accompany Plaintiff and her relative while the former waited for his flight. (Docket Nos. 39–1 ¶ 35; 63–1 ¶ 35.) ICE withdrew Plaintiff and Bonilla's Airport IDs due to these incidents. (Docket Nos. 39–1 ¶ 37; 63–1 ¶ 37.)

## C. ICE Request for Removal

In compliance with the ICE Contract's requirements, MVM informed ICE's Contracting Officer Representative, Elpidio Nuñez, of the alleged security violations committed by Plaintiff and Bonilla. (Docket Nos. 39–1 ¶ 41; 63–1 ¶ 41.) On June 26, 2014, Nuñez requested a copy of the security video recordings for relevant to Plaintiff's Airport visit on June 13, 2014. (Docket Nos. 39–1 ¶ 41; 63–1 ¶ 41.) The videos received by Nuñez show instances in which Plaintiff and Bonilla went through secured doors while Plaintiff was off duty. (Docket Nos. 39–1 ¶ 44; 63–1 ¶ 44.) The parties dispute whether the videos explicitly show that Plaintiff and Bonilla did not follow the correct procedure for gaining access through the Airport's secured doors. (Docket Nos. 39–1 ¶ 45; 63–1 ¶ 45.)

On June 30, 2014, Nuñez informed several ICE and MVM employees that it was his position that the incident of June 14, 2014, amounted to disqualifying information as to Plaintiff and Bonilla, which required their immediate removal from the ICE Contract. (Docket Nos. 39–1 ¶ 48; 63–1 ¶ 48.) That same day, Juan Colón–Montañez, on behalf of MVM, responded that they had referred the matter to MVM's Human Resources Department. (Docket Nos. 39–1 ¶ 49; 63–1 ¶ 49.) MVM notified Plaintiff of her suspension on July 2, 2014. (Docket Nos. 39–1 ¶ 35; 63–1 ¶ 35.)

**2.** This is what MVM has referred to as "piggybacking". According to MVM:

Piggybacking is a term commonly used in the context of Airport security referring to one person following another through an access point without using his or her own identification card and/or security key/code (unless it is an authorized escort). As such, piggyback occurs when one employee gains access through an electronically controlled door utilizing his/her Airport ID and security code and allows an unauthorized person, including a person who does not have an ID or someone who has an ID but does not follow the correct process, to access the restricted area with or without the intent for that person to register his/her entry. (Docket No. 39–1 ¶ 23.) Plaintiff disputes having engaged in any misconduct associated with "piggybacking" and argues that, far from representing a security violation, it is actually a common practice at the Airport. (Docket No. 63–1 ¶ 23.)

Unsatisfied with MVM's response, on August 4, 2014 Nuñez reached out to Camilo Cuellar, ICE Management & Program Analyst, and recommended that Plaintiff and Bonilla be permanently removed from the ICE Contract. (Docket Nos. 39–1 ¶¶ 50–51; 63–1 ¶¶ 50–51.) On August 12, 2014, Cuellar requested that MVM immediately remove Plaintiff and Bonilla from the ICE Contract. (Docket Nos. 39–1 ¶ 53; 63–1 ¶ 53.) MVM terminated their employment the following day. (Docket Nos. 39–1 ¶ 58; 63–1 ¶ 58.)

## D. Protected Activities and Retaliation

Plaintiff alleges that MVM retaliated against her for several protected activates that she engaged during her employment with MVM. For purposes of clarity, the Court will separately discuss each alleged protected activity.

### 1. 2012 Witness Statement

On January 27, 2012, MVM Human Resources Director Sandy Bradshaw ("Bradshaw") requested that Plaintiff issue a witness statement recounting an incident that she witnessed between Flores and MVM Quality Control employee Joan Mercado ("Mercado"). (Docket Nos. 1 ¶ 20; 10 ¶ 20.) Plaintiff submitted the witness statement on February 10, 2012. Id. In the statement, Plaintiff questioned her supervisors' competency and qualifications in managing, addressing and resolving workplace disputes. (Docket Nos. 1 ¶ 21; 10 ¶ 21.) She also requested Bradshaw to investigate the situation and take corrective action. (Docket Nos. 1 ¶ 22; 10 ¶ 22.)

### 2. Flores' case

On June 22, 2014, Plaintiff received a subpoena to testify in Wanda Flores' lawsuit against MVM. (Docket Nos. 63–1 ¶ 35; 77 at 13.) The deposition was held on July 3, 2014. Id. The day prior to the deposition, MVM Supervisor Jennifer Morales warned her "to put things in a balance" when testifying. (Docket Nos. 63–1 ¶ 35; 63–16 at 102, line 1; 77 at 13.) Plaintiff interpreted this statement as threat of further disciplinary actions against her if she offered adverse testimony against MVM. Id.

### 3. Bonilla's EEOC Charge

On August 12, 2014, the EEOC notified MVM of the harassment and discrimination charges that Bonilla had filed. (Docket Nos. 39–1 ¶ 56; 63–1 ¶ 56; 63–11.) Plaintiff argues that this notification prompted MVM to terminate her, along with Bonilla, the following day. (Docket Nos. 39–1 ¶ 56; 63–1 ¶ 56.) MVM counters that MVM General Counsel and Vice–President Christopher McHale was the one who made the decision to terminate Plaintiff, and he was unaware of the EEOC charge at the time. (Docket No. 63–1 ¶ 56.)

## E. EEOC Charge and Procedural Background

On September 9, 2014, Plaintiff filed a retaliation charge against MVM before the EEOC, claiming to have been subject to acts of retaliation by MVM that took place between the dates of July 3, 2013 and August 13, 2014. (Docket Nos. 39–1 ¶¶ 65–66; 63–1 ¶¶ 65–66.) Plaintiff only marked the "Retaliation" box of the EEOC charge. (Docket Nos. 39–1 ¶ 66; 63–1 ¶ 66.)

The EEOC issued a Notice of Right to Sue on March 24, 2015 and Plaintiff subsequently filed the present suit against Defendants on June 24, 2015. (Docket Nos. 1 ¶ 10; 10 ¶ 10.) In the Complaint, Plaintiff claims that she was suspended and eventually terminated from her employment at MVM due to her sex and that MVM retaliated against her for engaging in a protected activity. (Docket No. 1 ¶¶ 62, 66–67, 71 and 73.)

In the Complaint, Plaintiff recites several incidents where she was disciplined

more severely than her male co-workers. (Docket No. 1 ¶¶ 23–26, 32–35.) On the other hand, her retaliation claim is rooted in her involvement in two separate proceedings against MVM brought forth by two of her coworkers. These coworkers alleged that they were harassed and discriminated against in their workplace because of their sex. (Docket No. 1 ¶¶ 17–22; 52–57.)

MVM denies having discriminated or retaliated against Plaintiff. (Docket No. 10 ¶ 2.) MVM further alleges that Plaintiff was unfit to work under the ICE Contract, as she had been the subject of disciplinary action several times, including the "piggybacking" incident. Id. at 14. Furthermore, MVM claims that it had the obligation to remove Plaintiff from duty given the explicit terms of the ICE Contract. Id. ¶ 57. MVM also raised several other affirmative defenses, including that Plaintiff failed to exhaust administrative remedies with respect to some, or all, of the claims, and that Plaintiff did not engage in a protected activity. Id. at 15.

On November 4, 2015, the federal actors originally named as defendants moved to dismiss for failure to state a claim and lack of jurisdiction. (Docket No. 21.) The Court granted the motion to dismiss given that Plaintiff was not a federal employee and thus did does not have a valid cause of action against the federal actors named in the Complaint. (Docket No. 34.) Partial Judgment was entered on August 5, 2016, dismissing the Complaint as to the federal government actors. (Docket No. 36.) On December 15, 2016, MVM and McHale also moved to dismiss the claims against them under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. (Docket No. 23.) The Court granted MVM and McHale's motion and entered judgment on February 26, 2016 dismissing all claims against McHale and

dismissing Plaintiff's claims pursuant to Articles 1802 and 1803 of the Puerto Rico Civil Code against MVM. (Docket No. 27.)

MVM moved for summary judgment on all remaining claims: sex discrimination and retaliation under Title VII of the Civil Rights Act; similar state law claims under Puerto Rico's Law No. 100 and Law No. 115, and wrongful dismissal under Law No. 80. (Docket No. 40 at 1.) MVM argues that there are no real controversies of material facts as to the following: (1) Plaintiff failed to exhaust administrative remedies regarding its sex discrimination claims under Title VII; (2) some of Plaintiff's claims are time-barred; (3) Plaintiff did not engage in a protected activity for purposes of Title VII's protection against retaliation; (4) MVM had legitimate, non-discriminatory, reasons to terminate Plaintiff; (5) MVM was obligated to remove Plaintiff from the ICE Contract pursuant to its terms; and (6) Plaintiff is contractually barred from asserting an unjustified dismissal claim. Id. at 7, 9, 11, 14, 22, 28–29.

Plaintiff opposed the motion for summary judgment, averring that there are multiple genuine issues of material fact that call for a trial. (Docket No. 63–2 at 1.) First, Plaintiff rejects MVM's contention that she incurred in misconduct on June 14, 2014, given that she had authorization to go to the Airport to drop-off a relative prior to starting her shift at the GSA Center. Id. at 2, 16–17. She also counters MVM's characterization of "piggybacking" as a serious security violation, arguing that, on the contrary, it was a common practice for which there was no explicit prohibition. Id.

Plaintiff also argues that the mere temporal proximity between when she testified in Flores' Title VII case, and when MVM terminated her, is sufficient to raise a *prima facie* case of retaliation. Id. at 7. Hav-

ing established this temporal proximity, Plaintiff avers that the question of whether her termination occurred because she testified is one that a jury should answer. Id. at 7. Plaintiff also finds a material factual controversy in whether MVM disciplined her more severely than her male coworkers, as she claims occurred at least three times. (Docket Nos. 39–1 ¶ 41; 63–1 ¶ 41.)

MVM replied raising several arguments. First, MVM claims that Plaintiff did not adequately contest some of the statements of facts from MVM's Statement of Uncontested Facts and thus requests that the Court deem them admitted. (Docket No. 77 at 2–3). It also offered its own version of some of the events that Plaintiff discussed in its Opposition. Id. at 4–15. Moreover, MVM claims that Plaintiff did not address MVM's contention that Plaintiff failed to exhaust administrative remedies as to her sex discrimination claims or that some of its claims are time-barred. Id. at 15–16. Finally, it rejected some of Plaintiff's arguments on the merits. Id. at 17–21.

## II. Preliminary Matters and Admissibility Objections

Each of the parties has raised several objections related to the admissibility of some of the evidence presented by the opposing side. Plaintiffs move the Court to disregard those affidavits used by MVM to support its motion for summary judgment not based on the affiants' personal knowledge. (Docket No. 63–2 at 3.) Additionally, Plaintiff requests that the Court exclude those "statements from interested witnesses which are not free from *impeachment* during Trial's cross examination." Id. Plaintiff also moves the Court to disregard McHale's affidavit because it contradicts statements from a deposition that he gave in another Title VII case. Id. Furthermore, Plaintiff asks the Court to exclude Elpidio Nuñez's and Camilo Cuellar's affidavits because MVM did not disclose them as potential witnesses. Id.

On the other hand, MVM moved to strike statements in Plaintiff's affidavit not based on Plaintiff's personal knowledge; that contradict Plaintiff's prior deposition testimony; or that are conclusory allegations. (Docket No. 81 at 3.) The Court will also discuss several deficiencies associated with Plaintiff's cross-motion for summary judgment that preclude the Court from granting summary judgment in her favor.

### A. Sham Affidavits

### 1. McHale's post-deposition affidavit

■ Plaintiff asks that the Court disregard McHale's affidavit because it allegedly contradicts McHale's prior deposition testimony in a different case. (Docket No. 63–2 at 3.) However, Plaintiff failed to discuss how McHale's affidavit contradicts his prior testimony. (See Docket No. 63–2.) The Court, nevertheless, reviewed MVM's Statement of Uncontested Facts in Support of Motion for Summary Judgment (Docket No. 39–1) for all the instances in which MVM attempted to support a statement of fact with McHale's affidavit. It also reviewed Plaintiff's Opposing Statement of Facts (Docket No. 63–1) for all the instances in which Plaintiff supported its contention of a statement of fact with McHale's prior deposition.

In several instances, Plaintiff claims that McHale was aware of the EEOC charges that Bonilla had filed prior to terminating Plaintiff's employment. (Docket No. 63–1 ¶ 57.) As support, she cites to McHale's deposition in Bonilla's Title VII case, where he stated that he might have received notice of Bonilla's charge on August 12, 2014. (See Docket No. 63–17 at 107, lines 16–24.) MVM notified Plaintiff of her termination on August 13, 2014. (Docket Nos. 39–1 ¶ 58; 63–1 ¶ 58.)

In his affidavit, McHale states that the decision to terminate Plaintiff's employment was "based exclusively on the Government's request and the ICE Contract and not on any protected conduct carried out by any of these individuals." (Docket No. 42–3 ¶ 19.) Plaintiff claims that McHale's admission that he may have received notice of the EEOC charge the day prior to terminating Plaintiff contradicts his assertion that notification of the charge played no part in the decision to terminate Plaintiff. (Docket No. 63–1 ¶ 57.) The Court finds no contradiction between both assertions, since both are addressing different issues. In the cited deposition testimony, McHale was asked when he received the EEOC fax with the notification of the charge filed by Bonilla. (Docket No. 63–17 at 107.) He answered that he was not sure if he received it in the evening of August 12, 2014, or the next day, but that he was sure that it arrived after ICE requested that MVM remove Plaintiff and Bonilla from the ICE Contract. Id. This is entirely consistent with MVM's defense as to the retaliation claim: while notice of the charge may have arrived prior to the notification of Plaintiff's termination, the charge played no role in the termination decision. (See Docket No. 39–1 ¶ 54.) Finding no contradiction, Plaintiff's request to exclude McHale's affidavit is **DENIED**.

### 2. Plaintiff's Affidavit

■ MVM claims that Plaintiff's post-deposition affidavit attempts to create issues of material facts—and defeat summary judgment—by contradicting the testimony provided by Plaintiff in her deposition. MVM moves to strike six statements of Plaintiff's affidavit that it believes contradict her prior deposition testimony. (Docket No. 81 at 3.)

Finding no clear contradiction between the cited statements of Plaintiff's deposition and Plaintiff's affidavit, MVM's motion to strike at Docket No. 70 is **DENIED**.

### B. Lack of personal knowledge

■ Plaintiff claims that "[n]o defense affiant was a witness to plaintiff's visit to LMMIA worksite on June 14, 2014." (Docket No. 63–2 at 3.) As a result, MVM's affiants "are improperly relying on the inadmissible hearsay of former MVM employee Abraham Ortiz .... MVM's only true *eyewitness*." Id. It seems that Plaintiff is implying that all of the affidavits provided by MVM that detail the incidents of June 14, 2014, should be stricken because they are not based on personal knowledge and are, instead, "based on hearsay". Id. Plaintiff did not provide any details as to the specific affidavits—much less the portions thereof—which she seeks that the Court exclude.

The Court, regardless, searched MVM's Statement of Uncontested Facts in Support of Motion for Summary Judgment for all the instances in which it contains assertions of fact regarding the June 14, 2014 incident, which rely on statements under penalty of perjury of declarants from anyone other than Abraham Ortiz. (See Docket No. 39–1.) The only possible statements that Plaintiff could be referring to are Elpidio Nuñez' and Christopher McHale's, to the extent that they narrate some of the events of June 14, 2014, given that it is uncontested that they did not witness Plaintiff's movements through the Airport. However, it is uncontested that both Nuñez and McHale obtained and saw video footage of the relevant security cameras for the times in which Plaintiff was at the Airport on that day. (Docket Nos. 39–1 ¶¶ 43–45; 63–1 ¶¶ 43–45.) It is further undisputed that they also obtained the access logs for the relevant secured doors that they accessed on that day. (Docket Nos 39–1 ¶¶ 46–47; 63–1 ¶¶ 46–47.)

The information contained in their assertions related to the factual events of June 14, 2014 is entirely consistent and limited to the information that could be obtained from security camera footage and access logs. Finding no basis to Plaintiff's evidentiary objection, it is hereby **DENIED.**

### C. "Not free from impeachment"

■ Plaintiff has also objected to MVM's "use of affiants that ... are statements of interested witnesses which are not free from *impeachment* during Trial's cross examination." (Docket No. 63–2 at 3.) Plaintiff provides no support or explanation for its argument, no details as to who the interested witnesses are, in what their alleged interests consist, why are they not free from impeachment or—more importantly—how all of this is relevant to the admissibility of their testimony. Finding no merit in the request, it is hereby **DENIED.**

### D. Lack of disclosure of Cuellar and Nuñez as witnesses

■ Plaintiff claims that the Court should exclude Nuñez and Cuellar's affidavits because MVM did not disclose them as potential witnesses, "thus depriving the plaintiff of her right to confront and cross-examine their testimony during the discovery phase." Id. MVM responded that (1) it did disclose Nuñez and Cuellar as potential witnesses and (2) regardless, Plaintiff could not have been deprived of any right to confront and cross-examine their testimony in the discovery phase since Nuñez was actually a party to this case, and both Nuñez and Cuellar were identified by name by the Plaintiff in the Complaint,

eliminating the possibility that Plaintiff did know that they were persons with personal knowledge of some of the facts of the case.

Since the Court notes that the docket corroborates all three of MVM's defenses, (see Docket Nos. 1 ¶¶ 6, 51, 54–55, 54–58; 36; 74–1; 74–2), no further discussion is warranted. Plaintiff's request is **DENIED.**

### E. Plaintiff's Cross–Motion for Summary Judgment

Plaintiff simultaneously filed a cross-motion for summary judgment with her opposition to MVM's motion for summary judgment. (Docket No. 63–3.) However, the motion contains serious procedural and substantive defects that do not allow the Court to consider the merits of Plaintiff's claims. First, the motion fails to identify the claims for which summary judgment is sought as required by Rule 56(a). See FED. R. CIV. P. 56(a). The motion also lacks a memorandum of law, in violation of Local Rule 7(a) or, for that matter, any discussion of why the movant is entitled to judgment as a matter of law. See id. ("The court shall grant summary judgment if the movant *shows* that there is no genuine dispute as to any material fact *and the movant is entitled to judgment as a matter of law*.") (emphasis added); see also L. Civ. R. 7(a) (D.P.R. 2010). Moreover, the motion also fails to include a supporting statement of material facts "as to which the moving party contends there is no genuine issue of material fact to be tried." L. Civ. R. 56(b) (D.P.R. 2010).

Even if Plaintiff's Statement of Additional Facts,[3] is deemed as the cross-motion's Supporting Statement of Material Facts, it fails to show that there is no genuine issue of material fact—as to all of

---

3. Plaintiff's Statement of Additional Facts was included with Plaintiff's Opposing Statement of Material Facts as their Reply Statement of Material Facts pursuant to Local Rule 56(d)

(Docket No. 63–1 at 46). It was not presented as the cross-motion's Supporting Statement of Material Facts pursuant to Local Rule 56(b).

the essential elements of any of Plaintiff's claims.

Plaintiff has not identified the claims for which summary judgment is appropriate, nor the reasons why she should prevail. As a result, Plaintiff's Cross–Motion for Summary Judgment at Docket No. 63–3 is **DENIED**.

### III. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, ... and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325, 106 S.Ct. 2548. "The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado–Denis v. Castillo–Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. See Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences. Id. at 255, 106 S.Ct. 2505. Moreover, at the summary judgment stage, the Court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

### IV. Legal Analysis

MVM moves for summary judgment on Plaintiff's remaining claims: sex discrimination and retaliation under Title VII and similar local statutes. As to the sex discrimination claims under Title VII, MVM argues that Plaintiff failed to exhaust administrative remedies. (Docket No. 40 at 7–20.) Alternatively, Plaintiff argues that some sex discrimination claims are time-barred and that all are without merit. Id. According to MVM, the claims under the local anti-discrimination statute, Law 100, are also time-barred and without merit. Id. at 11–20.

As to Plaintiff's retaliation claims, under Title VII and under Law 115, the local anti-retaliation statute, MVM moves for judgment primarily on insufficient evidence grounds. (Docket No. 40 at 20–29.) MVM also seeks summary judgment on Plaintiff's Law 80 claim, arguing that the CBA contractually bars her from asserting an unjustified dismissal claim in court. Id. at 29–31. In the alternative, MVM claims

that Plaintiff's dismissal was justified. Id. at 31–33.

## A. Title VII Sex Discrimination Claims: Exhaustion of Administrative Remedies

██ An employee must exhaust administrative remedies before filing a Title VII suit in federal court. Franceschi v. U.S. Dep't. of Veterans Affairs, 514 F.3d 81, 84–85 (1st Cir. 2008) (citing Love v. Pullman Co., 404 U.S. 522, 523, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972)) ("The Title VII administrative process begins with the filing of an administrative charge before the EEOC.") The purpose of filing an administrative charge as a prerequisite to commencing a civil action is to promote early conciliation between the parties, as well as to provide prompt notice of the claim to the employer. Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996). Subject to limited exceptions, failure to exhaust administrative remedies closes the door to federal court. Velazquez–Ortiz v. Vilsack, 657 F.3d 64, 71 (1st Cir. 2011) (quoting Franceschi, 514 F.3d at 85).

██ The fact that an EEOC charge has been filed "does not open the courthouse door to all claims of discrimination." Id. The federal court complaint must "bear some close relation" to the allegations made in the administrative complaint. Id. (citing Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005). In other words, the allegations formulated in the EEOC charge constrain the permissible scope of the future federal court complaint. Id. at 71. Although the specific language used in the factual statement of the EEOC charge does not determine the scope of the civil action, at a minimum it must alert the employer as to the basis of the discrimination claim that the employee seeks to pursue in federal court. Id. (citing Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 32 (1st Cir. 2009).

██ The "scope of the investigation rule" allows an employee to include in the complaint claims related to acts of discrimination that the EEOC investigation could have been reasonably expected to uncover, regardless of whether they were actually investigated. Thornton, 587 F.3d at 31–32 (citing Davis v. Lucent Techs., Inc., 251 F.3d 227, 233 (1st Cir. 2001)). This rule allows a district court to "look beyond the four corners of the underlying administrative charge" to determine whether the employee exhausted the required administrative remedies. Id. at 33. District courts must not allow a plaintiff, however, "to extend his claim endlessly beyond the bounds and parameters encompassed by the administrative charge." Id. at 32.

██ Plaintiff exhausted administrative remedies as to her retaliation claims. (See Docket Nos. 39-1 ¶¶ 65–66; 63-1 ¶¶ 65–66.) However, MVM argues that Plaintiff did not exhaust administrative remedies regarding her sex discrimination claims. (Docket No. 40 at 9.) As support, MVM sets forth two arguments. Frist, that Plaintiff only marked the box corresponding to retaliation charges, and did not mark the box corresponding to sex discrimination charges, in the charge filed before the EEOC. Id. Second, MVM contends that Plaintiff not allege that she was discriminated based on her sex in the charge's factual statement. Id.

Plaintiff concedes that she did not mark the box corresponding to sex discrimination claims in her EEOC charge. (Docket No. 63-2 at 9.) Nevertheless, Plaintiff counters that the EEOC charge "was sufficiently broad in scope" to trigger an investigation of the sex discrimination claims along with the retaliation claims. Id. Moreover, she avers that there are no claims in the Complaint inconsistent with the scope of the EEOC investigation. Id. at 10.

The EEOC charge, however, confirms otherwise. According to the factual allegations included in the charge, on July 2, 2014, MVM supervisor Jennifer Morales suggested that Plaintiff "seize the opportunity" she was given and that she should "put it in a balance" when she testified the next day in a deposition for another Title VII case against MVM. (Docket No. 39–13 at 1.) Plaintiff further claimed that she was suspended for five days and given a final warning on the day of the deposition, for conduct related to the alleged "piggybacking" incident. Id. Plaintiff's allegations in the charge also include that, after she served her suspension, MVM withdrew her Airport ID and, on July 17, 2014, removed her from her shifts and assigned her to work on an "on call" basis. Id. at 1–2. This meant that she was scheduled to work thirty-two hours or less per week. Id. at 2. She added that other employees "who also did not possess an I.D. badge were assigned to my former position". Id.

The charge also states that MVM discharged Plaintiff from employment on August 13, 2014, a day after MVM received notice of Bonilla's Title VII charge. Id. Plaintiff concludes the factual allegations in the charge by stating that she "was retaliated against for having participated in a protected activity, in violation of the Section 704(a) of [Title VII.]" Id. Plaintiff also limited the dates during which the discrimination against her took place to between July 3, 2014 and August 13, 2014. Id. at 1.

In sum, Plaintiff's EEOC charge does not include any allegations that she was discriminated on the basis of her sex, or any other allegation that may have reasonably triggered an investigation by the EEOC of discriminatory practices based on sex by MVM against Plaintiff. In fact, although Plaintiff stated in the EEOC charge that the earliest date in which discrimination took place was on July 3, 2014, in the Complaint she supports her disparate treatment claims with incidents that took place prior to July 3, 2014. (See Docket No. 1 ¶¶ 23–35.) The only exception being Plaintiff's allegation in the Complaint that other male employees also engaged in conduct similar to the conduct for which she was suspended on July 3, 2014, but were not subject to similar disciplinary actions. (Docket No. 1 ¶ 52.) Plaintiff, however, did not include this allegation in her EEOC charge.

Based on these facts, the Court finds that Plaintiff did not exhaust the required administrative remedies regarding her sex discrimination claims. See Velazquez–Ortiz, 657 F.3d at 71. As a result, MVM's motion for summary judgment as to Plaintiff's sex discrimination claims under Title VII is **GRANTED**. Plaintiff's Title VII sex discrimination claims are hereby **DISMISSED with prejudice.**

### B. Retaliation

Title VII makes it unlawful for an employer to retaliate against a person who has opposed discriminatory employment practices "or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing'." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 60, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citing 42 U.S.C. § 2000e–3(a)).

To prove a claim of retaliation, a plaintiff must establish that she: (1) engaged in protected conduct under Title VII; (2) suffered a materially adverse employment action that harmed the plaintiff inside or outside the workplace enough to 'dissuade a reasonable worker from making or supporting a charge of discrimination,'; and (3) that the adverse action taken against her was causally connected to his protected activity. Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir.

2009). The First Circuit has repeatedly acknowledged that the plaintiff's *prima facie* burden is not onerous and is easily satisfied. See, e.g., Calero–Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004).

■ Once the plaintiff satisfies his *prima facie* burden, the defendant must produce a legitimate, nondiscriminatory, reason for the adverse action. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (citations omitted). After the defendant satisfies this burden of production, it ultimately falls on the plaintiff to show that the employer's articulated reason was mere pretext to cover up retaliation. Id. at 478.

### 1. Plaintiff's *Prima Facie* Case

It is uncontested that Plaintiff suffered materially adverse employment actions on July 2, 2014, when MVM suspended Plaintiff and withdrew her Airport ID, and on August 13, 2014, when MVM terminated Plaintiff's employment. (See Docket Nos. 39–1 ¶¶ 35, 58; 63–1 ¶¶ 35, 58; see also 40 at 24–29.) Although MVM has not contested that Plaintiff engaged in *a* protected activity under Title VII, there is controversy as to which specific activities should be deemed protected. Moreover, since MVM has disputed the existence of a connection between Plaintiff's uncontested protected activity and the adverse employment actions that she suffered, the Court will then discuss Plaintiff's proffered evidence as to this essential element.

#### a. Protected Activity

■ First, the Court must identify Plaintiff's protected activity. In the Complaint, Plaintiff alleges to have engaged in protected conduct in two instances. The first relates to the witness statement that Plaintiff submitted on February 10, 2012, in which she detailed the harassing con-

duct of an MVM supervisor towards a female coworker and questioned her supervisors' qualifications given their poor handling of this and other disparate treatment and harassing incidents. (Docket No. 1 ¶ 21.) However, as explained above, Plaintiff's EEOC charge only encompassed discriminatory conduct that took place between July 3, 2014 and August 13, 2014. (Docket No. 39–13 at 1.) Moreover—and more importantly—the EEOC charge made no mention of Plaintiff's witness statement, or any retaliatory conduct connected it, which was submitted more than two years prior to the incidents discussed in the EEOC charge's factual statement. Id. Plaintiff seems to have recognized this inconvenient fact, since Plaintiff's brief makes no mention of the February 10, 2012 witness statement. (See Docket No. 63–2.) Plaintiff's Opposing Statement of Facts also lacks any reference to the witness statement. (See Docket No. 63–1.) Given that the activity clearly falls outside of the scope of Plaintiff's EEOC charge and that administrative remedies as to that specific claim of retaliation were not exhausted, the Court will not consider the submission of the February 10, 2012 witness statement for purposes of Plaintiff's retaliation claims.

The second protected activity alleged is Plaintiff's participation in Wanda Flores' lawsuit against MVM. (See Docket No. 1 ¶¶ 36–37, 43–44.) It is uncontested that Plaintiff testified in that case in a deposition taken on July 3, 2014. (Docket Nos. 39–1 ¶ 51; 63–1 ¶ 57; see also 63–1 ¶ 19; 77–1 ¶ 19.) Plaintiff's conclusion that her deposition testimony constitutes protected activity under Title VII was unopposed by MVM. (See Docket No. 40 at 24–26; see also id. at 22–23.) As such, Plaintiff has met the first prong of her *prima facie* case: on July 3, 2014, she engaged in a

protected activity under Title VII.[4]

### b. Nexus Between Adverse Actions and Protected Activity

As it is uncontested that Plaintiff suffered adverse employment actions, she has met the first two prongs of a *prima facie* retaliation case. The Court thus proceeds to consider the evidence that Plaintiff has set forth to establish a connection between the protected activity that she engaged in on July 3, 2014, and the adverse employment actions that she suffered on July 2, 2014, and on August 13, 2014.

In several instances, Plaintiff implies her July 2, 2014 suspension was in retaliation for the testimony that she would give the following day. For example, Plaintiff states the following: "By now, it is undisputed that Alexandra was summoned by defendants to *testify* in another Title VII claim against MVM, Inc., on July 3, 2014. It is undisputed she was later suspended and subsequently terminated from employment." (Docket No. 63–2 at 12.) Although far from clear, Plaintiff's statement may be construed as an allegation that she was suspended after she was *summoned* to testify, not after she actually testified, since that would be impossible because she received her suspension on July 2, 2014, the day before she engaged in the protected activity.

Plaintiff's argument fails for several reasons. Plaintiff's EEOC charge states that MVM's discriminatory conduct took place between July 3, 2014 and August 13, 2014.

(Docket No. 39–13 at 1.) However, her suspension was notified on July 2, 2014, which falls a day outside the dates in which Plaintiff alleged the discrimination for having taken part in protected activity against her took place. (See Docket No. 39–1 ¶ 35; 63–1 ¶ 35.) Furthermore, the EEOC charge makes no mention of when she was summoned to testify, when MVM found out that Plaintiff had been summoned to testify, or of any connection between the two. The factual allegations in the EEOC charge commence by narrating the events that took place on July 2, 2014, the day she was notified of her suspension and when she was allegedly threatened by an MVM supervisor with further disciplinary actions if she were to provide testimony unfavorable to MVM in the deposition that would take place the following day. (Docket No. 39–13 at 1.) It is notable that although in the EEOC charge Plaintiff stated that she was suspended on July 2, 2014, she stated that MVM's earliest *act of discrimination* took place the day after, which is when she first engaged in a protected activity. Id.

Plaintiff's claim amounts to arguing that she engaged in a protected activity by the mere fact of being summoned to testify. However, Plaintiff did not even bother to discuss how this conduct amounts to having "opposed" a practice made unlawful by Title VII or having "participated" in a Title VII enforcement proceeding. See 42 U.S.C. § 2000e–3(a).

---

4. Plaintiff has vaguely alluded to perhaps another protected activity. In Plaintiff's Opposition to Defendant's Motion for Summary Judgment, she claims "MVM Management *knew* she would be a witness to coworker Martha Bonilla's EEOC charge … [and that she] "was then terminated as *reprisal* for engaging or encouraging employee protected activity." (Docket No. 63 at 3.) Essentially, Plaintiff seems to seek that this Court find MVM's hypothetical prediction of Plaintiff's *future* participation in EEOC proceedings as encouraging protected activity under Title VII. Absent any proof that "MVM management *knew* she would be a witness to [Bonilla's] EEOC charge", and devoid of any discussion on how this mere anticipation constitutes protected activity under § 2000e–3, the Court deems this argument as waived. As a result, the only protected activity the Court will consider is the July 3, 2014 deposition.

Plaintiff has failed to set forth any evidence of retaliatory motive linking the fact that Plaintiff was summoned to testify in Flores' case and the suspension that she received on July 2, 2014. Plaintiff has pointed to her own deposition as support for the contention that she was retaliated against for participating as a witness in Flores' case. (See Docket No. 63–1 ¶ 61.) However, the portion of Plaintiff's deposition transcript cited narrates the events *after* she testified on July 3, 2014 and refers to adverse employment actions in general. Since Plaintiff was suspended on July 2, 2014, that portion of Plaintiff's testimony cannot be reasonable construed to have referred to the suspension. Moreover, Plaintiff did not point to any other portion of the deposition transcript in which she even implies any relationship between the suspension and the protected activity in question.

Plaintiff has also presented as evidence that MVM was the party that summoned her to testify in Flores' Title VII case, which implies that on June 22, 2014—the day that the subpoena was issued—MVM had knowledge of Plaintiff's participation in the case. (Docket Nos. 63–1 at 49, ¶ 23; 63–5 at 1.) Essentially, Plaintiff is asking the Court to infer, without supporting with evidence, that MVM summoned her to testify in Flores' case and subsequently suspended her for the testimony that she would give in the case, without Plaintiff having even testified yet. This argument is untenable.

■ Having rejected the possibility that Plaintiff may have engaged in a protected activity by the mere action of receiving a subpoena to testify issued by MVM, there is no plausible allegation of protected conduct that occurred *prior* to the suspension that MVM notified Plaintiff on July 2, 2014. Outside of special circumstances, the First Circuit has held that "an adverse employment decision that predates a protected activity cannot be caused by that activity." Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de PR, 671 F.3d 49, 56 (1st Cir. 2012). Plaintiff has thus failed to set forth any evidence linking the adverse employment action that she suffered on July 2, 2014, with any protected activity. As a result, the Court will not consider MVM's material adverse employment action against Plaintiff on July 2, 2014, for purposes of her retaliation claim, as Plaintiff has not presented evidence of a protected activity that preceded it.

■ The Court proceeds to consider the connection between the testimony that Plaintiff provided on July 3, 2014, and her termination on August 13, 2014. Plaintiff claims that the temporal proximity between the two events suffices for purposes of the present inquiry. (Docket No. 63–2 at 7.) Given First Circuit precedent, the Court agrees that the gap between the protected activity and Plaintiff's termination is sufficiently narrow to meet the relatively light burden of establishing a *prima facie* retaliation case. See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (1st Cir. 2015) (holding that a two-month gap between a protected activity and a material adverse action is sufficiently short for purposes of a *prima facie* case of retaliation).

Plaintiff has thus established a *prima facie* case of retaliation based on her participation in Flores' Title VII case and her subsequent termination.

### 2. Legitimate, Non-discriminatory Reasons

■ Plaintiff has established a *prima facie* case, thereby triggering a rebuttable presumption of unlawful retaliation arises. See Vera v. McHugh, 622 F.3d 17, 32 (1st Cir. 2010). MVM now bears the burden of

articulating a legitimate, nondiscriminatory reason for the adverse employment actions taken against Plaintiff. Id. To this end, MVM claims that Plaintiff:

[W]as terminated at the request of ICE, under the terms of the ICE Contract, after an investigation revealed that she incurred in serious security violations on June 14, 2014, including using her MVM uniform and credential to access Airport secured doors for personal reasons and engaging in the piggyback violation.

(Docket No. 40 at 27.) MVM argues that these actions constitute violations of federal regulations and of MVM's Standard of Conduct. Id. As MVM has articulated a legitimate, non-discriminatory reason for the adverse employment action that Plaintiff suffered on August 13, 2014, the presumption of unlawful retaliation is rebutted. McHugh, 622 F.3d at 32–33. The burden now shifts to Plaintiff "to show that the defendant's explanation is a pretext for unlawful retaliation." Planadeball, 793 F.3d at 175.

### 3. Pretext for Retaliation

To defeat summary judgment, Plaintiff must raise a genuine issue of fact as to whether her July 3, 2014 deposition testimony in Flores' Title VII was the "but-for" cause of her August 13, 2014 termination. See Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 220 (1st Cir. 2016) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, ——

U.S. ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013)).

Plaintiff claims that MVM's proffered reasons for terminating her employment are pretext for unlawful retaliation due to Plaintiff's participation in Flores' Title VII proceedings. (Docket No. 63–2 at 7.) As discussed above, the gap between when Plaintiff testified and when she was terminated was sufficient to establish a *prima facie* retaliation case. However, temporal proximity between the protected activity and the materially adverse employment action consisting of two-months is, by itself, insufficient *to raise an inference of pretext.* See Planadeball, 793 F.3d at 179. Thus, it is clear that Plaintiff must point to additional evidence, aside from temporal proximity of that magnitude, to allow for an inference of pretext. Id.

Plaintiff's argument that MVM could have reassigned—rather than terminated—is unavailing. (Docket No. 63–2 at 7.) MVM had authority under the CBA to dismiss Plaintiff if the Government requested her removal from working under the ICE Contract or if Plaintiff's Airport ID was revoked.[5] (Docket No. 39–1 ¶¶ 61–63; 63–1 ¶¶ 61–63.) It is uncontested that the Government withdrew Plaintiff's Airport ID and requested that she be removed from duty under the ICE Contract. (See Docket Nos. 39–1 ¶¶ 37, 53; 63–1 ¶¶ 37, 53.) Plaintiff has not presented any

---

5. Plaintiff claims that, under the CBA, MVM was barred from terminating Plaintiff based on the June 14, 2014 incident, as she was terminated on August 13, 2014, and Article 8, Section 4 of the CBA deems untimely any disciplinary action issued forty-five days after the event that gave rise to the disciplinary action. (Docket No. 63–1 ¶ 57.) However, Plaintiff was disciplined on July 2, 2014, for the June 14, 2014 incident. (See Docket Nos. 39–1 ¶ 33; 63–1 ¶ 33.) ICE requested that Plaintiff be removed from duty under the ICE Contract on August 12, 2014, and it is uncontested that this is an independent ground for dismissal under the CBA. (See Docket Nos. 39–1 ¶¶ 61, 64; 63–1 ¶¶ 61, 64.) The notice of her dismissal was issued within forty-five days of the event that gave rise to the disciplinary action—the Government's request that Plaintiff be removed from the ICE Contract—which shows that MVM's dismissal complied with the portion of the CBA invoked by Plaintiff. Thus, there is no basis to Plaintiff's claim that MVM's decision to terminate was untimely under the CBA.

evidence to establish that MVM had the obligation to assign her to any of its other contracts after she was deemed unfit to work under the ICE Contract. In light of the CBA's explicit terms, MVM's refusal to do so could not be interpreted by a reasonable jury to suggest that MVM's reasons were pretext to mask its retaliatory animus towards Plaintiff.

Next, Plaintiff urges that the Court to infer evidence of MVM's retaliatory motives because Plaintiff was terminated several hours after MVM received notice of Bonilla's EEOC charge. (Docket No. 63–2 at 8.) Put another way, Plaintiff argues that causation could be inferred between Plaintiff's July 3, 2014 deposition in *Flores'* Title VII case and her August 13, 2014 termination, based on Bonilla's Title VII charge against MVM, filed on August 12, 2014. However, Plaintiff's protected activity—the July 3, 2014 deposition in Flores' Title VII case—had nothing to do with Bonilla's subsequent Title VII charge. It is thus difficult to understand why MVM would have retaliated against Plaintiff for her participation in *Flores' Title VII case* when *Bonilla* filed her *unrelated Title VII charge*. The only way in which Bonilla's EEOC charge would be relevant to Plaintiff's retaliation claim is if she had alleged participation in the proceedings—which would have been difficult since the charge was filed the day before she was terminated, not allowing much time for Plaintiff to participate in the case prior to her termination—or if she had alleged that she was terminated for opposing MVM's discrimination against Bonilla, which is not even an argument that Plaintiff has pursued or supported with evidence. See § 2000e–3(a). In any event, when courts have held that mere temporal proximity "can create an inference of causation in the proper case", it is, logically, in the context of the Plaintiff's protected activity, not an unrelated third-party's. See Planadeball, 793 F.3d at

177. See also id. ("In order to draw such an inference, however, 'there must be proof that the decision maker knew *of the plaintiff's* protected conduct when he or she decided to take the adverse employment action.' ") (citations omitted) (emphasis added).

Plaintiff has also alleged that MVM did not terminate other employees that committed security violations, and that this disparate treatment shows that MVM's proffered reasons were a pretext. (See Docket No. 63–1 ¶ 41.) Yet, Plaintiff has failed to set forth any evidence of any employee that MVM did not terminate after a government entity requested that the employee be removed from duty under MVM's contract with the entity. In fact, it is uncontested that ICE also requested that Bonilla and David Santiago be removed from duty under the ICE Contract, and that they were subsequently terminated by MVM. (Docket Nos. 39–1 ¶¶ 54, 58; 63–1 ¶¶ 54, 58.)

Another attempt to create an issue of material fact as to the reason for her termination is Plaintiff's claim that Supervisor Morales threatened her with further disciplinary action if she provided adverse testimony against her employer. (See Docket Nos. 63–1 ¶¶ 16, 35, 41, 56–57, 61, 64; see also 63–2 at 15.) Plaintiff has supported her claim with her deposition testimony on the events of July 2, 2014, where she stated that MVM Supervisor Jennifer Morales, referring to Plaintiff's suspension, told her "that it was the last chance that she was being given" and that prior to her deposition in Flores' case she should "put things on a balance." (Docket No. 63–16 at 101–102.)

Setting aside possible admissibility issues, it is questionable whether Supervisor Morales' statements support an inference of causation between Plaintiff's protected

conduct and her termination, given their isolated nature and the fact that they were made by a non-decision maker with no established connection or influence over the decision to terminate Plaintiff. See Medina–Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) ("Obviously too, the employee must show that the retaliator knew about her protected activity—after all, one cannot have been motivated to retaliate by something he was unaware of."); Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) ("In other words, the adverse action must have been taken for the *purpose* of retaliating. And to defeat summary judgment, a plaintiff must point to *some* evidence of retaliation by a pertinent *decisionmaker*.") (citation omitted) (third emphasis added); see also Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) (" 'stray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus") (citation omitted).

As Plaintiff has not alleged that Supervisor Morales had any role in the decision to terminate her employment, for Supervisor Morales' statements to even stand for the proposition that Plaintiff's termination was an act of retaliation, she needed to, at a minimum, provide evidence that somehow links Supervisor Morales' alleged discriminatory animus with McHale's decision to terminate Plaintiff. See Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015) (discussing how the retaliatory animus of an employee's supervisor could be imputed to the relevant decisionmaker under the "cat's paw theory"). The record shows that Plaintiff failed to do so.

Plaintiff's final attempt at evading summary judgment goes by way of implying that an inference of retaliatory motives may be drawn from the fact that, by terminating Plaintiff a month prior to Wanda Flores' trial date, MVM "sought to 'silence' her", since MVM knew that she would provide testimony in that case on September 17, 2014. (Docket Nos. 63–2 at 17; 63–17 at 1.) This argument, however, is perplexing. The Court fails to see how MVM could achieve Plaintiff's "silence" by terminating her one-month prior to her testimony, since that would only provide Plaintiff with stronger motivation to testify against her ex-employer, as well as afford MVM significantly less influence over Plaintiff, given that she would no longer have to worry about the possible adverse consequences of testifying against her employer. Also, it must be noted that Plaintiff had not yet engaged the protected activity in question and, as discussed above, subject to certain exceptions not applicable to this case, the First Circuit has held that "an adverse employment decision that predates a protected activity cannot be caused by that activity." Muñoz, 671 F.3d at 56. No inference of pretext or retaliatory motives could be drawn from the temporal proximity between Plaintiff's termination and her future testimony in Flores' Title VII trial.

The evidence that Plaintiff has presented is clearly insufficient, examined individually and collectively as a whole, for her retaliation claim to survive summary judgment. If the "motivating factor" test were applicable to Plaintiff's retaliation claim, then perhaps the evidence on the record might have been enough to support an inference that retaliation *motivated* the adverse employment action. However, since the more stringent "but-for" causation standard applies to retaliation claims, at trial Plaintiff would need to show that that her termination would not have occurred if she had not testified in Flores' Title VII case on July 3, 2014. See Velazquez–Perez v. Developers Diversified Realty Corp.,

753 F.3d 265, 278 (1st Cir. 2014) (citing Nassar, 133 S.Ct. 2517 at 2532–33).

This is where Plaintiff's case reaches a dead-end, as Plaintiff failed to contest with evidence several material facts related to MVM's legitimate, non-discriminatory reason for terminating her that are, as a result, fatal to the retaliation claim.

Plaintiff worked under the ICE Contract. (Docket Nos. 39–1 ¶ 6; 63–1 ¶ 6.) The ICE Contract allows ICE to direct MVM to remove from duty under the contract any employee disqualified for security reasons. (Docket Nos. 39–1 ¶ 5; 63–1 ¶ 5.) The collective bargaining agreement ("CBA") that applies to Plaintiff's employment with MVM specifically recognizes that an employee may be "dismissed or otherwise disciplined" if that employee "is removed from working under the Employer's Contract with the Government by the Government, at the request of the Government, or if the employee's credentials are denied or withdrawn by the Government." (Docket Nos. 39–1 ¶¶ 59–61; 63–1 ¶¶ 59–61; see also 42–3 at 68.)

On June 14, 2014, *prior to reporting for duty*, Plaintiff went to the Airport to drop-off a relative. (Docket Nos. 39–1 ¶¶ 25–26; 63–1 ¶¶ 25–26.) Although her supervisor had requested that she start her shift earlier than scheduled, he did authorize Plaintiff to drop-off her relative prior to heading to the GSA Center. (Docket Nos. 39–1 ¶¶ 24–25; 63–1 ¶¶ 24–25.) Her supervisor also informed her that it "was ok" to wear her uniform while she took her relative to the Airport. (Docket No. 69–1 at 5.) Plaintiff accessed some of the Airport's secured areas during her time at the Airport on June 24, 2014, notwithstanding the fact that the training that she received from the Airport's administrator stated that this is not permitted. (Docket Nos. 39–1 ¶¶ 29, 34; 63–1 ¶¶ 29, 34.) It is further uncontested that in certain instances in which Plain-

tiff passed through the Airport's secured doors she did not follow the proper procedure to do so, given that she either "piggy-backed" off Bonilla's access, or vice-versa. (Docket Nos. 39–1 ¶¶ 19, 33, 44–47; 63–1 ¶¶ 19, 33, 44–47.) Security records show that Plaintiff and Bonilla did not each complete the required procedure when they passed through secured doors, although security camera footage examined by MVM show them passing at the same time. (Docket Nos. 39–1 ¶¶ 42–47; 63–1 ¶¶ 42–47.) Plaintiff received verbal training related to the use of the Airport ID and agreed to abide by federal regulations governing civil aviation security. (Docket Nos. 39–1 ¶¶ 18–20; 63–1 ¶¶ 18–20.)

MVM received information of the incident on June 24, 2014. (Docket Nos. 39–1 ¶ 31; 63–1 ¶ 31.) Consistent with its obligations under the ICE Contract, MVM informed Nuñez of the security violations allegedly committed by Plaintiff and two other MVM employees. (Docket Nos. 39–1 ¶¶ 31, 41; 63–1 ¶¶ 31, 41.) Then, MVM examined the relevant Airport security videos, which document Plaintiff and Bonillas' movements through the Airport on June 14, 2014. (Docket Nos. 39–1 ¶ 32; 63–1 ¶ 32.)

On June 30, 2014, Nuñez wrote an email to MVM's management in which he inquired what disciplinary measures MVM took against Plaintiff and stated his position that Plaintiff's conduct on June 14, 2014 was disqualifying information that required immediate removal from duties under the ICE Contract. (Docket Nos. 39–1 ¶ 48; 63–1 ¶ 48.) On July 2, 2014, MVM suspended Plaintiff. (Docket Nos. 39–1 ¶ 32; 63–1 ¶ 32.) Plaintiff's Airport ID had already been revoked and turned over to ICE. (Docket Nos. 39–1 ¶ 32; 63–1 ¶ 32; see also 42–4 at 12.)

By July 23, 2014, Nuñez had not received all the information that he had re-

quested concerning Plaintiff's incident and, as a result, decided to go up ICE's chain of command to determine what action to take. (Docket Nos. 39–1 ¶ 50; 63–1 ¶ 50.) On August 4, 2014, Nuñez wrote an email to Camilo Cuellar, ICE Management & Program Analyst, in which he informed of the alleged security violations committed by Plaintiff and Bonilla on June 14, 2014, and recommended that they be permanently removed from duty under the ICE Contract. (Docket Nos. 39–1 ¶ 51; 63–1 ¶ 51.)

On August 12, 2014, Cuellar sent an email to Jay Vergel, MVM Operations Manager, requesting that Plaintiff, along with Bonilla and another MVM employee, "be removed from the ICE Contract Immediately." (Docket Nos. 39–1 ¶ 53; 63–1 ¶ 53.) According to Cuellar, he based his decision on the "seriousness of the violations [allegedly committed by the employees], which represented security violations, and on the provisions of the ICE Contract." (Docket Nos. 42–9 ¶ 9; 39–1 ¶ 55; 63–1 ¶ 55.) Cuellar and Nuñez were not aware of any protected activity by Plaintiff when Cuellar made the request that Plaintiff be removed from the ICE Contract. (Docket Nos. 39–1 ¶ 54; 63–1 ¶ 54.)

Based on the preceding facts, it is uncontested that under the ICE Contract MVM was contractually obligated to remove Plaintiff from duty. (Docket Nos. 39–1 ¶¶ 4–5; 63–1 ¶¶ 4–5.) Moreover, since ICE revoked Plaintiff's Airport ID and requested her removal from the ICE Contract, it is uncontested that the CBA allowed MVM to terminate Plaintiff. (Docket Nos. 39–1 ¶¶ 37, 61–63; 63–1 ¶¶ 37, 61–63.)

At the very least, MVM had *a* legitimate, non-discriminatory basis for terminating Plaintiff. The Court must note that the record is devoid of any evidence intended to attribute discriminatory or retaliatory animus to any of ICE's employees,

the only other persons identified on the record as having been *involved* in the decision to terminate Plaintiff. In other words, Plaintiff has not even attempted to raise an issue of fact on whether ICE's request was based on improper motives. In fact, the record shows that ICE conducted its own investigation of the June 14, 2014, which included reviewing the video footage from the relevant security cameras.

Based on the foregoing discussion, the Court concludes that Plaintiff has not set forth evidence that creates a genuine issue of material fact for a reasonable jury to find that MVM terminated Plaintiff because she engaged in the protected activity in question. As a result, MVM's motion for summary judgment as to Plaintiff's retaliation claims under Title VII is **GRANTED.** Plaintiff's retaliation claims under Title VII are hereby **DISMISSED with prejudice.**

### C. Claims under Law 115

Puerto Rico's Law 115, the local anti-retaliation statute, closely mirrors Title VII's anti-retaliation provision. Law 115 requires Plaintiff to demonstrate that she: "(1) participated in an activity protected by §§ 194 *et seq.*, and; (2) was subsequently discharged or otherwise discriminated against." Collazo v. Bristoll–Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010) (internal quotations omitted).

As Plaintiff failed to set forth sufficient evidence to sustain the Title VII retaliation claims, her Law 115 claims must suffer the same fate. As a result, MVM's motion for summary judgment as to these claims is **GRANTED.** Plaintiff's supplemental claim under Law 115 is hereby **DISMISSED with prejudice.**

### D. Other Supplemental claims

Generally, the dismissal of a Plaintiff's federal claims at the early stages of a case will warrant the dismissal, without preju-

dice, of any remaining supplemental claims. United States *ex. rel.* Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 15 (1st Cir. 2016) (citing Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). Upon dismissal of all federal claims, "the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Doral Mortg. Corp., 57 F.3d at 1177. The use of supplemental jurisdiction in these circumstances is completely discretionary, and is determined on a case-by-case basis. Id.

The Court has dismissed all of Plaintiff's federal claims and Plaintiff's Law 115 supplemental claim against MVM. The only remaining claims are those under Law 100 and Law 80. Since the Court dismissed Plaintiff's Title VII sex discrimination claim on jurisdictional grounds, the Law 100 sex discrimination claims are dismissed without prejudice, to allow Plaintiff to pursue the claim in local court if she so chooses. The same goes for Plaintiff's Law 80 claim, since it may involve issues of fact similar to the ones implicated by Plaintiff's Law 100 sex discrimination claims.

Based on the foregoing discussion, the Court **DISMISSES, without prejudice,** Plaintiff's remaining supplemental claims under Law 100 and Law 80.

## V. Conclusion

For the reasons stated above, MVM's motion for summary judgment at Docket No. 39 as to all remaining claims is **GRANTED.** Plaintiff's sex discrimination and retaliation claims under Title VII as well as Plaintiff's retaliation claim under Law 115 are hereby **DISMISSED with prejudice.** Plaintiff's supplemental claims under Law 100 and Law 80 are hereby **DISMISSED** without prejudice.

**SO ORDERED.**